IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 14, 2008 Session

# DENNIS J. HUGHES V. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Appeal by permission from the
Chancery Court for Davidson County**

**No. 06-1567-IV    Judge Jerry Scott, Senior Judge**

---

**No. M2007-01562-SC-R3-BP - Filed July 10, 2008**

---

This is a direct appeal from a judgment of the trial court, which set aside a decision by a hearing panel designated by the Board of Professional Responsibility granting a disbarred attorney's petition for reinstatement of his law license. The issue presented is whether the attorney, who was convicted of bribing a witness and conspiracy to bribe a witness in a criminal trial, has met the criteria for immediate reinstatement to the practice of law. Although the panel properly determined that the evidence clearly and convincingly proved the moral qualifications of the attorney and his knowledge of state law, we hold that the evidence failed to so meet the threshold as to the third requirement–that reinstatement would not be detrimental to the standing of the bar, the administration of justice, and the interest of the public. The judgment of the trial court is, therefore, affirmed.

**Tenn. Sup. Ct. R. 9 § 1.3  Direct Appeal; Judgment of the Davidson County Chancery Court Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and CORNELIA A. CLARK and WILLIAM C. KOCH, JR., JJ., joined. JANICE M. HOLDER, J., concurring and dissenting.

Richard McGee, Nashville, Tennessee, for the appellant, Dennis J. Hughes.

Nancy S. Jones, Chief Disciplinary Counsel for the Board of Professional Responsibility and James A. Vick, Deputy Chief Disciplinary Counsel, Investigations, for the appellee, Board of Professional Responsibility of the Supreme Court of Tennessee.

## OPINION

### Factual and Procedural Background

1

Dennis J. Hughes, the appellant, was licensed to practice law in Tennessee in 1987. In early 1995, while acting as defense counsel for Wayford Demonbreun, Jr., on a first degree murder charge, Hughes and Demonbreun's girlfriend, Suvonnya Lakeisha Smith, offered money to an eyewitness to the murder, Rhonda Williamson, in an effort to persuade her to recant her prior testimony during a preliminary hearing. In 1997, Hughes was convicted in Davidson County of bribery, a Class C felony, and conspiracy to commit bribery, a Class D felony, in violation of Tennessee Code Annotated sections 39-16-107 (2006) and 39-12-103 (2006).[1] The criminal court ordered concurrent sentences of four and one-half years and three years, respectively, and imposed fines totaling $15,000. On December 28, 1998, the Court of Criminal Appeals affirmed the convictions and sentence. State v. Hughes, M1997-00084-CCA-R3-CD, 1999 WL 1257882 (Tenn. Crim. App. Dec. 28, 1999). On May 22, 2000, we entered an order denying an application for permission to appeal.[2] On December 28, 2001, Hughes was released after serving two years in the county workhouse.

On June 24, 1997, immediately after the convictions and pursuant to section 14 of Supreme Court Rule 9, Hughes was summarily suspended from the practice of law. Later, the Board of Professional Responsibility ("BPR") filed a petition for final discipline. Pursuant to section 15 of Supreme Court Rule 9, Hughes filed an affidavit consenting to disbarment. On March 30, 2004, we entered an order of enforcement prohibiting Hughes from the practice of law effective the date of his summary suspension.

**Reinstatement Proceedings**

In October of 2004, seven and one-half years after his suspension from the practice of law, Hughes filed this petition for reinstatement. In 2006, a three-member panel ("Panel") appointed by the BPR heard the evidence.[3] See Tenn. Sup. Ct. R. 9, § 8.2 (2007). In addition to the issues directly leading to Hughes being disbarred, the parties stipulated as fact that Hughes, forty-two years old when he was licensed to practice law and sixty-one at the time of the hearing, had been the subject of other disciplinary proceedings. For example, on July 1, 1991, the BPR filed a petition for discipline against Hughes arising out of four complaints of misconduct; he ultimately entered guilty

---

[1] Because the relevant portions of Tennessee Code Annotated sections 39-16-107 and 39-12-103 have not changed from the version of the statutes in effect during Hughes' indictment in 1994 and subsequent convictions in 1995, we cite to the current version of the statutes.

[2] Afterward, Hughes filed an unsuccessful petition for post-conviction relief, contending that the state improperly failed to disclose a portion of its evidence against him in response to a bill of particulars. He also argued that the post-conviction court erred by limiting cross-examination as to whether the prosecutor in his criminal trial, Assistant District Attorney General John Zimmerman, had engaged in a pattern of non-disclosure in other cases. Hughes v. State, No. M2001-02454-CCA-R3-PC, 2003 WL 1094070 (Tenn. Crim. App. Sept. 3, 2003).

[3] Monica Edwards served as chair of a panel which also included William Neal McBrayer and Howard La Don Baltimore.

pleas to the charges in exchange for a public censure.[4]  In April of 1994, Hughes was indicted by the Criminal Court of Davidson County for assault, disorderly conduct, and resisting arrest arising out of a May 26, 1993, night court incident; thereafter, he was granted pre-trial diversion on the assault charge pursuant to Tennessee Code Annotated section 40-15-105 (Supp. 1995) (amended Supp. 2007).  At the same time, the disorderly conduct and resisting arrest counts were dismissed.[5]  On November 13, 1996, the BPR filed a petition for discipline against Hughes arising out of complaints of misconduct related.[6]  In December of 1997, shortly after his convictions, Hughes was suspended from the practice of law for failure to comply with continuing legal education requirements.  Finally, on January 27, 1998, the BPR filed a Supplemental Petition for Discipline against Hughes arising out of six complaints of misconduct.[7]

At the hearing, Hughes, who acknowledged a previous history of problems related to his use of alcohol, testified that he last consumed alcohol on August 15, 1997.  He then described his dramatic religious conversion in 1998 and his extensive efforts toward rehabilitation.  Fifteen other witnesses, including distinguished judges and attorneys, also testified in support of Hughes' reinstatement.  These witnesses included Ben H. Cantrell, attorney and former Judge of the Court of Appeals from 1980 until 2003; David Raybin, former Chairman of the Tennessee Supreme Court Commission on the Rules of Criminal Procedure and current member of the Tennessee Supreme Court Advisory Commission on the Rules of Practice and Procedure; Ed Yarbrough, former President of the Nashville Bar Association and criminal defense attorney who also represented Hughes at trial; Hamilton Gayden, Circuit Judge in Davidson County; Stephen Young, attorney and past President of Tennessee Association of Criminal Defense Lawyers; Edward T. Kindall, school board vice-chair, attorney in Davidson County for twenty-eight years, and member of the Tennessee Commission on Continuing Legal Education and Specialization; Aaron Holt, Judge of the Davidson County General Sessions Court, Division XI, for eight years; John P. Brown, Judge of the General Sessions Court, Davidson County, for twenty-four years; Ross Alderman, former trial lawyer and current Public Defender for Davidson County; Andrei Lee, Administrative Law Judge, State of

---

[4] The records indicate that one of the complaints was based upon his guarantee to two prospective clients that he could prevent indictment or incarceration in exchange for $100,000.  One of the individuals recorded the conversation and provided a fourteen page transcript.  The other three complaints were based upon his failure to communicate with clients.  Sanctions included ethics requirements, mentors within the profession, a practice monitor, and pro bono services.

[5] The assault charge was the result of a "tirade" Hughes directed towards a police officer during a session of night court in May of 1993.  Reportedly, Hughes resisted arrest and attempted to flee, but fell.

[6] Among the four complaints was one related to the May 26, 1993, night court incident.  Two were related to Hughes' felony convictions, one of which was filed by the late Judge Thomas Shriver, who presided over the Demonbreun murder trial, and a second of which was filed by Wayford Demonbreun, Jr. A fourth complaint was filed by Judge Seth Norman, who determined that Hughes had failed to notify a client about a scheduled criminal trial–an omission that led to a bail revocation.

[7] One of these complaints was filed by Michael L. Roden, an Assistant United States Attorney, who alleged that Hughes advised his client in a criminal case how to avoid detection when smuggling cocaine.  In the remaining five complaints, individuals alleged that they paid fees for Hughes' representation and that he neither provided his services nor refunded their fees.

Tennessee Department of Administration and State Board of Equalization; and Carol Crews, court officer for thirty years, twenty-four of which had been with the Davidson County General Sessions Court. More than sixty individuals, representing a broad cross-section of the public, submitted letters in support of Hughes' petition for reinstatement.[8]

Judge Cantrell was asked why he was supporting Hughes reinstatement:

I believe a person who has paid their debt to society and has turned their life around and intends to lead a new life is entitled to a second chance . . . . [A]fter Dennis got out of prison[,] . . . he came to see me in my office. He was very, very contrite. I think since we had been friends and I had introduced him to the supreme court, Dennis thought that he had disappointed me which he had. He wanted to make sure that he made amends for that, and he convinced me that he realized that he brought all of that calamity on himself and was determined to lead a new life, that he was not ever going to let that happen again.

It was his opinion that Hughes had been fully rehabilitated and that readmission to the bar, under his unique circumstances, would have no adverse effect upon the integrity of the bar, the administration of justice, or the public interest.

Raybin testified favorably to Hughes' knowledge of the law and his rehabilitated moral character. It was his opinion that the reinstatement of Hughes would be an asset to the public and to the profession "so that other lawyers could learn the message about what not to do and how you can potentially redeem yourself." Yarbrough testified similarly. It was his belief that Hughes had made "crucial errors" by getting too close to his criminal clients. He stated that Hughes' experiences and his willingness to publicly acknowledge his mistakes had served to benefit those in the practice of criminal law who might be tempted to act in a similar manner.

---

[8] The Panel marked the letters for identification purposes but declined to consider the letters on hearsay grounds. Hughes has not challenged that ruling. Individuals submitting letters included, for example, Bryant Millsaps, former Secretary of State for the State of Tennessee; Bradley S. Roberts, First Vice President and Financial Consultant with Hilliard Lyons in Knoxville; Dr. Mike Boyd, Senior Pastor of Wallace Memorial Baptist Church, Knoxville; Richard L. Barkley, DDS, Goodlettsville, Tennessee; David L. Alley, fellow member of Grace Baptist Church in Knoxville; Robert W Bell, radio talk show host and senior account executive for WRJZ radio, Knoxville; Sarah W. Fowler, teacher at Grace Christian Academy, Knoxville; Charles Watson, retired Financial Officer from Oak Ridge National Laboratory, Knoxville; The Reverend Stuart John Phillips, Rector of St. James The Less Episcopal Church, Madison, Tennessee; Marty Roberts, truck driver with Watkins Motor Lines in Knoxville; Tony Vandergriff, employee with City of Knoxville, Operations and Investigations Department, Traffic Engineering Division; Wendell Cooper, Senior Accountant with Bechtel Jacobs Company, Oak Ridge, Tennessee; Vicky Caldwell Curtis, public school teacher in Anderson County, Tennessee; Sandra Roberts, RN, Knoxville; Reverend Steve Humphreys, Executive Director for FOCUS Prison Ministries, Knoxville; L.A. Ezell, Chief Financial Officer of Oak Ridge Tool Engineering, Oak Ridge, Tennessee; William E. Llewellyn, Packaging Center Manager for the Knoxville News-Sentinel, Knoxville; Dale Fox, retired, Knoxville; Frankie Cate, RN and stay-at-home mom, Knoxville; Paul C. Sharp, electrician at BWXT Y-12, Oak Ridge, Tennessee; and Mickey Smith, master plumber, Knoxville.

Judges Gayden, Brown, Holt, and Lee all expressed the view that Hughes had not only reestablished his good moral character but had maintained his knowledge of the law throughout his disbarment. Each believed that Hughes had undergone a substantial positive change for the better and opined that his reinstatement as a lawyer would not be detrimental to the standing of the bar or the interest of the general public. Public Defender Alderman described Hughes as a different person since his trial and conviction. It was his opinion that Hughes had been completely rehabilitated and that his reinstatement would be no impunity to the bar or the administration of justice. Attorneys Kindall and Young testified similarly, attesting to Hughes' good moral character and his knowledge of the law. Carol Crews and her husband and family have maintained a friendship with Hughes, who often stayed at their residence after his release from custody. She stated that since his conversion, he no longer drank or used profanity and consistently tried to help others through prayer or other means of support.

Hughes' employer, Matthew Yorke, the owner of Signature Limousine Service, described Hughes as a model employee. Having been made fully aware of Hughes' background before his employment as a chauffeur, Yorke stated the two men enjoyed a positive relationship and that he would have no hesitation in hiring Hughes as his lawyer should he be reinstated. Ronnie Fox, a fellow Rotarian, befriended Hughes; he was aware of his background and expressed admiration for the reputation he had built in the Clinton and Knoxville areas of East Tennessee. Fox testified that he had seen firsthand Hughes' dedication to his church and his active participation in the business community.

Dr. Ronald Stewart, a pastor at the Grace Baptist Church in Knoxville, baptized Hughes in 1998. Dr. Stewart described Hughes as an "outspoken witness for the Lord." According to Dr. Stewart, Hughes first confessed his crimes privately and, when accepted as a "sinner," spoke of his conversion from the pulpit, providing the entire congregation with his testimonial. Dr. Stewart confirmed Hughes' level of participation in Bible study and outreach ministry.

Conversely, three witnesses opposed Hughes' petition: Victor T. Johnson, District Attorney General in Davidson County, whose assistants prosecuted Hughes at his trial for bribery; William L. Norton, attorney and then First Vice-President of the Nashville Bar Association Board, who appeared as the designee of the Association; and Susan Kay, an Associate Dean for Clinical Affairs, who teaches the rules of professional conduct to students at Vanderbilt University Law School. General Johnson testified that due to the extensive media coverage of the criminal trial, reinstatement would be "extremely detrimental to the public, the profession." Attorney Norton stated that the local bar was of the opinion that reinstatement "would degrade the public's confidence in the integrity of attorneys." Dean Kay agreed, asserting that reinstatement should be particularly difficult when the disbarment is for a serious offense. "Lawyers have a monopoly on [the judicial] branch of government," she explained, "and it is very important that in exercising [their duties] that lawyers act with integrity and don't bring down the judicial system with their acts. We are uniquely privileged to allow people access to that branch of government." All expressed particular concern about protecting the public interest and the reputation of the bar because of the nature of Hughes' high profile crimes which, in their view, qualified as particularly egregious within the legal

community–"striking at the heart of our system of jurisprudence."

On May 3, 2006, the Panel, after considering the proof and the applicable law, filed its order recommending that Hughes' petition for reinstatement should be granted, subject to the following conditions: "payment of all costs, criminal fines, and client reimbursements [and] participation in a formal mentoring program for a period of five (5) years." The Panel also encouraged Hughes to "tell his story so that members of the Bar would benefit from his experience and avoid his misdeeds."

On June 22, 2006, the BPR filed a petition for writ of certiorari in the Chancery Court of Davidson County seeking review of the Panel's decision as permitted by section 1.3 of Supreme Court Rule 9. The chancellor, by fiat, issued a writ of certiorari on June 23, 2006, ordering the BPR "to immediately make, certify and forward . . . a complete transcript of the proceedings, including exhibits submitted and all papers filed during the proceeding" to the court. Chief Justice Barker, by order entered on July 7, 2006, assigned Senior Judge Jerry Scott to "try the case and enter judgment" in the trial court. See Tenn. Sup. Ct. R. 9, § 1.5 (2007). In its Judgment, after presenting the procedural history of the case, the trial court summarized the testimony of Hughes and all fifteen of his character witnesses as well as the three witnesses who testified on behalf of the BPR. In reaching its decision, the court made reference to the four complaints that had been filed against Hughes for misconduct in 1992; his indictment by a Davidson County Grand Jury on three misdemeanor charges in 1993; his conviction for bribery and conspiracy to commit bribery in 1997; the disciplinary proceedings in 1996 based on four additional complaints; and the supplemental proceedings in 1998 based on six additional complaints. The court then acknowledged that the Panel had ruled that Hughes had shown by clear and convincing evidence that he met the criteria for reinstatement: (1) knowledge of the law; (2) moral character through rehabilitative efforts; and (3) no detrimental effect on the integrity of the bar, the administration of justice, and the public interest. While concurring with the Panel as to the first criteria, the trial court determined that Hughes had failed to establish the second and third criteria; that is, either his good moral character or that the resumption of his law practice would "not be detrimental to the integrity and standing of the bar or the administration of justice or subversive to the public interest." The court concluded that not enough time had passed since the disbarment and that Hughes was not yet "fit to be entrusted with professional and judicial matters and to aid in the administration of justice as an attorney and officer of the Court."

Hughes appealed the judgment directly to this Court as provided by our rules. See Tenn. Sup. Ct. R. 9, § 1.3. In response, the BPR argued that if Hughes was eligible for reinstatement, he should be required to take and pass the bar examination.

## Scope of Review for the Trial Court

Reinstatement of disbarred attorneys in Tennessee is governed in part by section 19.3 of Supreme Court Rule 9 which states that

> [t]he hearing panel shall schedule a hearing at which the petitioner shall have the burden of demonstrating by clear and convincing evidence that the attorney has the

moral qualifications, competency and learning in law required for admission to practice law in this state and that the resumption of the practice of law within the state will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive to the public interest.

Tenn. Sup. Ct. R. 9, § 19.3 (2007) (emphasis added).

The standard of review for a trial court's review of a hearing panel's decision is prescribed in section 1.3 of Supreme Court Rule 9. Prior to July 1, 2006, section 1.3 provided, in pertinent part, as follows:

The respondent or the Board may have a review of the judgment of a hearing committee in the manner provided by Tenn. Code Ann. § 27-9-101 et seq., except as otherwise provided herein. The review shall be on the transcript of the evidence before the hearing committee, its findings and judgment and upon such other proof as either party may desire to introduce. The trial judge shall weigh the evidence and determine the facts by the preponderance of the proof.

Tenn. Sup. Ct. R. 9, § 1.3 (2005) (emphasis added).

In Cohn v. Board of Professional Responsibility, 151 S.W.3d 473 (Tenn. 2004), we addressed application of this standard of review ("former standard") by the trial court as follows: "Where the trial judge bases his or her decision on the same evidence that is before the hearing panel, the trial judge must affirm the panel '[u]nless that evidence preponderates against the findings by the Committee.'" Id. at 481 (footnote omitted) (alteration in original) (quoting Gannon v. Bd. of Prof'l Responsibility, 671 S.W.2d 835, 837 (Tenn. 1984). Under this former standard, however, the trial court was not limited to a review of evidence before the hearing panel–it could admit any additional evidence that either party wanted to introduce. Tenn. Sup. Ct. R. 9, § 1.3.

Effective July 1, 2006, section 1.3 of Supreme Court Rule 9 was amended, in pertinent part as follows:

The respondent-attorney (hereinafter "respondent") or the Board may have a review of the judgment of a hearing panel in the manner provided by Tenn. Code Ann. § 27-9-101 et seq., except as otherwise provided herein. The review shall be on the transcript of the evidence before the hearing panel and its findings and judgment. If allegations of irregularities in the procedure before the panel are made, the trial court is authorized to take such additional proof as may be necessary to resolve such allegations. The court may affirm the decision of the panel or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the panel's findings, inferences, conclusions,

7

> or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is substantial and material in light of the entire record.
>
> In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the panel as to the weight of evidence on questions of fact.

Tenn. Sup. Ct. R. 9, § 1.3 (emphasis added).

Under this narrower standard of review ("amended standard"), the trial court may modify or reverse a hearing panel's decision only if one or more of the five enumerated circumstances are present. In addition, the trial court's review is limited to the "transcript of the evidence before the hearing panel and its findings and judgment [unless] allegations of irregularities in the procedure before the hearing panel are made." Id.

Hughes argues that the trial court erred by applying the former standard and by substituting its view of the evidence for that of the Panel. In response, the BPR argues in the alternative: first, that the trial court applied the proper standard of review and, second, that the trial court's decision was warranted under both the former and amended standards. The BPR asserts that the trial court properly weighed the evidence and determined the facts by a preponderance of the evidence as required by the former standard. The BPR further submits that even if the amended standard is applied, the Panel's decision "was arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion" because the Panel failed to apply the legal standards set forth by this Court. See Office of Disciplinary Counsel v. Davis, 696 S.W.2d 528, 532 (Tenn. 1985) (requiring, as a general rule, that one who has been disbarred for more than ten years can anticipate as a condition to reinstatement the taking of the bar exam); Murphy v. Bd. of Prof'l Responsibility, 924 S.W.2d 643, 647 (Tenn. 1996) (finding that the conduct of lying to a grand jury and trying to convince another witness to lie to the grand jury "strikes at the very heart and soul of the judicial system and without question would have a detrimental impact on the integrity and standing of the bar, the administration of justice and the public interest").

In Love v. Board of Professional Responsibility, No. M2007-00790-SC-R3-CV, 2008 WL 2002339 (May 12, 2008), ___ S.W.3d ___ (Tenn. 2008), this Court addressed the same issue–whether to apply the former or amended standard of review prescribed in section 1.3 of Supreme Court Rule 9. In Love, an attorney filed a petition seeking reinstatement following his suspension for theft. After a panel hearing and entry of the panel's decision favorable to Love, the BPR filed a petition for writ of certiorari, requesting modifications. The petition was granted and the trial court hearing took place some five weeks after the effective date of the amended version of section 1.3 of Supreme Court Rule 9. The judgment of the trial court was less favorable to

Love–requiring him to practice in a group setting with a practice monitor for five years, requiring a five year contract with the Tennessee Lawyers' Assistance Program, and limiting his practice to criminal law. In Love's appeal from the ruling of the trial judge, we determined that section 1.3 of Supreme Court Rule 9 is procedural and remedial in nature and, therefore, should be applied retrospectively "not only to causes of action arising before [its effective date], but also to all actions pending when [it] took effect, unless a contrary intention is indicated or immediate application would produce an unjust result." Id. at *6 (citing Kee v. Shelter Ins., 852 S.W.2d 226, 228 (Tenn. 1993); State Dep't of Human Servs. v. Defriece, 937 S.W.2d 954, 958 (Tenn. Ct. App. 1996)). We found that retrospective application of section 1.3 did not affect Love's "vested rights or liabilities" and did not impair an obligation of contract or otherwise produce an unjust result. Love, 2008 WL 2002339, at *6 (quoting Nutt v. Champion Int'l Corp., 980 S.W.2d 365, 368 (Tenn. 1998)). Accordingly, we held that the amended standard of review applied, and the trial court had exceeded its authority by the imposition of the additional restrictions.

In this case, the Panel hearing occurred on April 25-26, 2006. The trial court entered its judgment reversing the Panel's decision on June 7, 2007. The trial court's lengthy judgment, however, does not contain any reference to section 1.3 of Supreme Court Rule 9, as to the applicable scope of review. Thus, whether the trial court applied the former standard or the more restrictive amended version adopted in 2006 cannot be ascertained. Because the amended standard may be applied retroactively and because the rights of Hughes have not been adversely affected by the change, we hold that the amended standard should have applied as in the Love case.

## Scope of Review for the Supreme Court

The Supreme Court is the source of authority of the Board of Professional Responsibility and all of its functions. Brown v. Bd. of Prof'l Responsibility, 29 S.W.3d 445, 449 (Tenn. 2000). As a part of our duty to regulate the practice of law in this state, we have the ultimate disciplinary responsibility for violations of the rules governing our profession. Doe v. Bd. of Prof'l Responsibility, 104 S.W.3d 465, 469-70 (Tenn. 2003). We examine judgments in light of "this Court's inherent power [and] essential and fundamental right to . . . administer [the] rules pertaining to the licensing . . . of attorneys." In re Burson, 909 S.W.2d 768, 773 (Tenn. 1995); see generally, Cohn, 151 S.W.3d at 486; In re Youngblood, 895 S.W.2d 322, 325 (Tenn. 1995).[9]

Pursuant to section 1.3 of Supreme Court Rule 9, we review attorney disciplinary matters "upon the transcript of the record from the circuit or chancery court, which shall include the transcript of evidence before the hearing panel." As stated, the trial court may reverse or modify the panel decision only when the panel's findings, inferences, conclusions, or decisions (1) violated constitutional or statutory provisions, (2) exceeded the panel's jurisdiction, (3) were based upon unlawful procedure, (4) were arbitrary or characterized by abuse of discretion, or (5) were not supported by substantial and material evidence. Tenn. R. Sup. Ct. 9, § 1.3 (2007). Under the

---

[9] Prior to Love, this Court's review of attorney disciplinary proceedings was de novo with a presumption that the trial court correctly decided the case, unless the preponderance of the evidence was contrary to the trial court's decision. See Burnett v. Bd. of Prof'l Responsibility, 100 S.W.3d 217, 220 (Tenn. 2003).

amended standard, "the [trial] court shall not substitute its judgment for that of the panel as to the weight of the evidence on questions of fact." Id. Our charge is to assure that the trial court properly exercises its authority whether the panel decision is affirmed, modified, or reversed. In Love, we adopted the same standard for our review of a trial court's decision when a party prosecutes an appeal to this Court as permitted under section 1.3. Thus, we can reverse a hearing panel only when the panel's "findings, inferences, conclusions, or decisions" fall within any of the five enumerated circumstances in section 1.3.[10]  In adopting this standard, we pointed out that Supreme Court Rule 9, section 1.3, is "virtually identical to Tennessee Code Annotated section 4-5-322(h), the statutory section covering judicial review under the Uniform Administrative Procedures Act." Love, 2008 WL 2002339, at *7. When none of the first three grounds for reversal are present, as is the case here, the hearing panel should be upheld unless the decision was either arbitrary or capricious, "characterized by an abuse, or clearly unwarranted exercise, of discretion" or lacking in support by substantial and material evidence. Cf. CF Indus. v. Tenn. Pub. Serv. Comm'n., 599 S.W.2d 536, 540 (Tenn. 1980) (applying the judicial review standard as contained in the Uniform Administrative Provisions Act). In City of Memphis v. Civil Service Commission of Memphis, 216 S.W.3d 311, 316 (Tenn. 2007), a case involving the scope of our review after an administrative decision, we specifically approved the language in Jackson Mobilphone Co. v. Tennessee Public Service Commission, 876 S.W.2d 106 (Tenn. Ct. App. 1993):

> In its broadest sense, the standard[s in (4) and (5)] require[] the court to determine whether the administrative agency has made a clear error in judgment. An arbitrary [or capricious] decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.
>
> Likewise, a reviewing court should not apply Tenn. Code Ann. § 4-5-322(h)(5)'s "substantial and material evidence" test mechanically. Instead, the court should review the record carefully to determine whether the administrative agency's decision is supported by "such relevant evidence as a rational mind might accept to support a rational conclusion." . . . . The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.

Id. at 110-11 (emphasis added) (citations omitted).

**Analysis**

Having identified the applicable standards of review for the trial court and for this Court, we now must consider whether the trial court exceeded its authority by setting aside the Panel's decision and denying Hughes' petition for reinstatement. Fundamental to our deliberations is that the license to practice law in this state is a privilege, not a right. See Tenn. Sup. Ct. R. 9, § 3.1 (2007). "A

---

[10] Prior to Love, this Court's review of attorney disciplinary proceedings was de novo with a presumption that the trial court correctly decided the case, unless the preponderance of the evidence was contrary to the trial court's decision. See Burnett v. Bd. of Prof'l Responsibility, 100 S.W.3d 217, 220 (Tenn. 2003).

10

person suspended from the practice of law is not entitled to have that privilege restored simply because that person has served the sentence imposed for a violation of the criminal laws." Murphy, 924 S.W.2d at 647. Nevertheless, Tennessee and a majority of other jurisdictions, thirty-four states and the District of Columbia, are consistent with the ABA model disciplinary rules and have no procedure for permanent disbarment. In those jurisdictions, the length of time that a lawyer is prohibited from petitioning for reinstatement ranges from five to ten years. Brian Finklestein, Note, Should Permanent Disbarment Be Permanent?, 20 Geo. J. Legal Ethics 587, 590-91 (2007) (citing Memorandum from Scott J. Drexel, Chief Trial Counsel to Members of the Bd. Comm. On Regulation, Admissions & Discipline Oversight (Nov. 7, 2005)). Our Supreme Court Rule 9, section 19.2 provides that "[a] person who has been disbarred after hearing or by consent may not apply for reinstatement until the expiration of at least five years from the effective date of disbarment." Parenthetically, five states–New Jersey, Ohio, Oregon, Indiana, and Kentucky–mandate that all disbarments are permanent. In eight states, disbarments can be permanent under certain circumstances. Two states, because reinstatement is approved so infrequently, are listed as de facto permanent disbarment jurisdictions. Finklestein, supra, at 590-91.

In this state, therefore, reinstatement is always an available remedy but is warranted only when the criteria articulated in section 19.3 of Supreme Court Rule 9 are satisfied by clear and convincing evidence. That is, the petitioner must clearly and convincingly show that he or she (1) has the moral qualifications and (2) legal competency to be admitted to the practice of law in this state and, further, that (3) reinstatement will not be detrimental to the integrity and standing of the bar or administration of justice, or subversive to the public interest. See Tenn. Sup. Ct. R. 9, § 19.3.

In O'Daniel v. Messier, 905 S.W.2d 182 (Tenn. Ct. App. 1995), our Court of Appeals defined the clear and convincing standard as follows:

> While it is more exacting than the preponderance of the evidence standard, it does not require such certainty as the beyond a reasonable doubt standard.
>
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

905 S.W.2d at 188 (citations omitted).

In recommending that Hughes be reinstated, the Panel, after considering the evidence pro and con, concluded that he had clearly and convincingly proved

> that he has the knowledge of the law sufficient to completely represent his clients, that he has shown that he has been rehabilitated and is now of the moral character to undertake the profession of law in an ethical manner and that his resumption of the practice of law will not be detrimental to the integrity of the bar, the administration

11

of justice and the public interest.

The Panel further determined that it "[was] of the opinion based upon the testimony presented, [its] review of Section 14.2, Rule 9 of the Supreme Court . . . and case law that the passage of time since [Hughes'] disbarment is sufficient taking into account the seriousness of [Hughes'] unethical acts for re-entry into the legal profession."[11]  The trial court, having received the same evidence considered by the Panel, disagreed as to two of the criteria–moral character and the effect of any reinstatement on the integrity of the bar, the administration of justice, and the public confidence.

Upon our own consideration of the record, we must determine whether the trial court had a proper basis for overturning the Panel's decision and by holding that their decision was not clearly and convincingly supported by substantial and material evidence as to the three essential requirements.  Tenn. Sup. Ct. R. 9, § 1.3 (2007).

## Standards for Reinstatement
### A.  Moral Qualifications

We first address whether Hughes demonstrated that he has the moral qualifications to be reinstated to the practice of law.  See Tenn. Sup. Ct. R. 9, § 19.3.  The evidence necessary to demonstrate that one is morally qualified to practice law in this state  requires more than conclusory statements; it should also include "specific facts and circumstances which have arisen since [one's conviction] that demonstrate either rehabilitation or remorse."  Murphy, 924 S.W.2d at 647.

In the hearing before the Panel, Hughes testified that during his ten years as a practicing attorney, his primary area of practice was criminal law.  He described himself as aggressive and angry between 1992 and 1996, partly because of the rape of his wife during the period of their engagement and his belief that the police were not trying to find the offender.  He explained that, as a consequence of his mental state, he drank heavily, used foul language, and was unfaithful in his marriage.  He stated that he was devastated by his convictions for bribery.  He admitted responsibility for his misconduct, apologized to the Panel, and acknowledged that his crimes of bribery and conspiracy to bribe a witness had reflected poorly upon the legal profession.  In response to a question as to what led him to his convictions, Hughes stated as follows:

> Well, I remember in law school, Judge Todd taught us [that] reputation is what people think of you, but character is what you really are.  And I would consider myself to have had two character flaws.  One was alcohol, and one was women.

> And I've tried every day to try to relook and think, because . . . my life has changed so much, and I'm so proud of it today, but I allowed those two deviltries to allow me

_____

[11] Rule 9, section 14.2 states: "The term 'serious crime' shall include any felony under the laws of Tennessee and any other crime a necessary element of which as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a 'serious crime.'"

12

to drift into areas that I should never have gone.

And looking back, . . . I want to take this time to apologize to you-all . . . because I absolutely brought a stench to the profession that I absolutely love. And I will promise you and I have promised other people that I will spend the rest of my time refining and making . . . right. I owe that to my profession, I owe that to my God, and I owe that to myself.

Hughes testified that he was baptized on March 15, 1998. While he was incarcerated, he conducted Bible studies for other inmates and taught many to read and write. He stated that he had not consumed any alcohol since August of 1997 and further testified to his active participation in church-related activities and ministries. Since his release, Hughes has been invited to speak to a variety of organizations regarding his convictions and the change in his life.

He filed a post-judgment affidavit documenting his continuing efforts to comply with the Panel's suggestion to "tell his story" to other attorneys. Among his more recent engagements, he has addressed the Tennessee Association of Criminal Defense Lawyers Fall/Spring 2006 CLE seminar in Knoxville, Memphis, and Nashville on the subject of Ethical Dilemmas in the Modern World. He was the keynote speaker at the Twenty-Fifth Annual Knoxville/Knox County Community Leaders Prayer Breakfast in September of 2007.

All fifteen of Hughes' witnesses testified that Hughes possessed the moral qualifications to practice law in this state. Many of these witnesses provided details as to the positive changes in his character and behavior since his conviction for bribery and expressed the firm belief that the conversion was change is genuine. Judge Brown remarked, "I'm a great believer in redemption, and I believe Dennis has been redeemed." Yarbrough, who had maintained continual contact with Hughes since the 1997 convictions, commented as follows:

I think Dennis is a totally new person. If you want to talk about Dennis nine years ago, no way, no way, shouldn't have a license, shouldn't be allowed to have a license.

The Dennis of today is a new person, and I am very confident that he has got not only the moral qualifications to have a law license but is probably better suited now, having been through what he's been through, than a lot of the rest of us to know what the hazards are and to be able to pull it off.

Raybin agreed, saying, "I'm here because of all the people I've heard of having to come back over here, he's the only one that I think has changed to the point where I would feel comfortable sitting in Court with him as my co-counsel in a case." Further, Attorney Young confirmed that Hughes had taken full responsibility for his misdeeds, sought forgiveness, acknowledged his alcoholism, and taken all necessary steps towards rehabilitation. The several other judges appearing on Hughes' behalf attested to his conversion. Many of the witnesses described the different ways in which

13

Hughes had continuously demonstrated the transformation of his character.

The BPR offered little, if any, evidence that Hughes had failed to rehabilitate his moral character. While District Attorney General Johnson testified that Hughes' reputation for truth and veracity and for conducting himself properly between 1987 and 1996 with attorneys "wasn't particularly good," he acknowledged his unawareness of Hughes' progress since his convictions. Attorney Norton and Dean Kay had no knowledge of Hughes' moral qualifications at the time of the hearing.

In our view, the record in this cause includes substantial and material evidence supportive of the Panel's conclusion that Hughes had proved with clear and convincing evidence that he has the moral qualifications to be reinstated to the practice of law. Of the conditions imposed by the Panel, he has completely fulfilled two requirements. Having a limited earning capacity, Hughes has made restitution to his former clients and has paid all court costs. As to his remaining obligations, he produced documentation indicating a payment schedule of one hundred dollars a month towards a third condition – payment of his $15,000 court-imposed fine. Those qualify as expressions of good faith on the issue of his character. Finally, while disagreeing with the Panel on the moral character issue, the trial court nevertheless made particular note of Hughes' rehabilitative efforts and his "much improved moral character." As to this criteria, the trial court should have affirmed the decision of the Panel, which heard the testimony firsthand, and accredited those witnesses attesting to Hughes' reformed moral character.

## B. Legal Competency

In addition to showing that he has the moral qualifications to be admitted to the practice of law, Hughes had the further burden to demonstrate that he possessed the legal competency to be admitted to the practice of law in this State. See Tenn. Sup. Ct. R. 9, § 19. Pursuant to section 19.7 of Supreme Court Rule 9, "reinstatement may be conditioned upon the furnishing of such proof of competency . . . which proof may include . . . successful completion of [the bar] examination." Further, this Court has held that if a disbarred or suspended attorney has not practiced law in ten or more years, there is a presumption that, at a minimum, successful completion of the essay portion of the bar examination is necessary, absent extenuating circumstances. See Davis, 696 S.W.2d at 532. In Burnett, 100 S.W.3d at 225, however, we ruled that when "the petitioner has taken specific measures during the course of the suspension which enabled [him] to maintain his . . . competency and knowledge of the law," that would "certainly qualif[y] as extenuating circumstances."

Hughes testified that he felt competent doing any type of legal work except income tax. Raybin confirmed his abilities:

> He's always been a very competent lawyer in the sense of knowing some criminal law. Many times he and I would converse and talk about cases. He would have the knowledge enough to ask the right questions, which I always considered to be the most important thing. He was very effective as a litigator. He knew the law . . . . [He] still is a competent attorney.

14

In addressing Hughes' legal competency, Young stated, "He's done more continuing legal education hours [than] I've done in the last several years. . . . He has continued to educate himself." Judge Brown testified that Hughes had audited an ethics course at the Nashville School of Law after his release from incarceration.

In Burnett, 100 S.W.3d at 219, an attorney filed for reinstatement after being suspended for nine years and seven months. By the time of the panel hearing, Burnett had not practiced law for well over ten years. In that case, the sole issue presented for our review was whether he had demonstrated that he had the competency and learning in law for admission to practice law. Burnett proved that he had earned 122 hours of general legal education and 21.5 hours of ethics over a nine-year period; while incarcerated, he had spent twelve to fourteen hours a day in the law library studying the law and assisting other inmates prepare legal papers in both criminal and civil matters; he had been employed in law-related jobs since his suspension; he reviewed and studied advance sheets containing appellate decisions; he assisted both of his sons with their legal educations and preparation for the Tennessee bar examination; he discussed substantive legal issues and strategic trial strategy with his sons after they became licensed attorneys; and he had served as a panelist on a daily news and public radio program in Nashville where he responded to questions regarding the law. Id. at 218. We found that this evidence had overcome the presumption that reinstatement should be condition upon his successful completion of the bar examination. Id. at 226.

The order disbarring Hughes from the practice of law was effective June 24, 1997, the date of his summary suspension. Although he filed his petition some seven years later, now approximately eleven years have passed since the effective date of his disbarment. Thus, it is presumed that Hughes should be required to take the essay portion of the Tennessee bar examination, absent extenuating circumstances.

The circumstances here are, however, indistinguishable from those in Burnett with regard to proof of competency and learning in the law. Hughes had completed 199 hours of legal education credits during the time when only 150 hours were required. He established that he had studied independently at the University of Tennessee College of Law library during the two years before his incarceration, reading the advance sheets and studying case law. He has continued his studies at the law library since his release, including a semester of ethics at the Nashville School of Law and review of the legal materials provided by Judge Brown. In establishing the conditions for Hughes' reinstatement, the Panel did not impose any further requirement to prove his legal competency. The trial court did not take issue with the Panel's ruling in that regard, observing that Hughes had the competency and learning to practice criminal law.

The record includes substantial and material evidence that Hughes has maintained his competency and knowledge of Tennessee law. In our opinion, the Panel and the trial court properly ruled on the issue. Further, in light of our ruling in Burnett, the undisputed evidence that Hughes has undertaken his continuing legal educational responsibilities since his disbarment relieves him from the requirement to take the bar examination.

15

## C. Impact of Reinstatement on the Integrity and Standing of the Bar and Administration of Justice and the Public Interest

The third and final criterion that a petitioner must demonstrate with clear and convincing proof is that reinstatement will not have a detrimental effect on the standing or integrity of the bar or administration of justice or be subversive to the public interest. Tenn. Sup. Ct. R. 9, § 19.3. While the first two criteria for reinstatement–moral qualifications and competency in the law–focus primarily on Hughes' conduct since his criminal convictions and disbarment, this third criterion requires us to consider not only the nature of the conduct that led to his disbarment but the impact, if any, that his reinstatement, in the context of his wrongs, will have on the integrity of and public trust in our system of jurisprudence. That assessment is more subjective in nature, and on occasion, may be less dependent upon the proof in the record than our own sense of professional responsibility and the respect we, as the final regulatory authority, hold for the society we serve.[12] Indeed it is the ultimate duty of this supreme court to regulate the legal profession and those entitled to engage in the practice. In re Burson, 909 S.W.2d at 773. While we have delegated important tasks to the Board of Professional Responsibility and rely upon that body to administer the directives embodied in our rules, this court has not relinquished altogether our plenary powers of review on matters of public policy.

In Love, we outlined the new standard of review for the trial court when reviewing determinations of the Panel. In discussing our responsibilities on appeal, we analogized our scope of review in professional responsibility with that outlined in the Uniform Administrative Procedures Act. See Tenn. Code Ann. § 4-5-322(a)(1), (h)(1)-(5)(A) (2005). Then we determined that the Panel "may not be reversed or modified unless arbitrary or capricious or characterized by an abuse, or clearly unwarranted exercise, of discretion and must stand if supported by substantial and material evidence." Love, __ S.W.3d at __. As to this third criterion, we must qualify this statement.

---

[12] The Preamble to the Code of Professional Responsibility provides, in part, as follows:

> The continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law grounded in respect for the dignity of the individual and the individual's capacity through reason for enlightened self-government. Law so grounded makes justice possible, for only through such law does the dignity of the individual attain respect and protection. Without it, individual rights become subject to unrestrained power, respect for law is destroyed, and rational self-government is impossible.
>
> Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this rule requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.
>
> * * *
>
> but in the last analysis it is the desire for respect and confidence of the members of the legal profession and the society which the lawyer serves that should provide to a lawyer the incentive for the highest possible degree of ethical conduct. The possible loss of that respect and confidence is the ultimate sanction. So long as its practitioners are guided by these principles, the law will continue to be a noble profession. This is its greatness and its strength which permit of no compromise.

Tenn. Sup. Ct. R. 8.

While Love describes the standard of review applicable to the trial court, that opinion should not be read as a limitation upon this Court's ultimate authority to intercede on a policy basis regarding admission to the bar. We here recognize that Rule 9, section 1.3 is not perfectly analogous to the Uniform Administrative Procedures Act because of our supervisory prerogative over the Board of Professional Responsibility. We reserve the right to invoke this power on those occasions when the integrity of the bar and the public trust of our system of justice is at stake.[13]

During the ten years preceding his convictions, Hughes' record as a practicing attorney was not unblemished: four complaints were filed against him for misconduct in 1990; he was indicted by a Davidson County Grand Jury on three misdemeanor charges in 1994; disciplinary proceedings were initiated against him based on four additional complaints in 1996; and supplemental proceedings were lodged in 1998 based on six additional complaints. While Hughes' conduct during this ten-year period was not the reason for his disbarment, it is important in our review because, together with his felonious acts of bribing a witness and conspiring to bribe a witness, it demonstrates a pattern of behavior over a period of years that conflicts with the standards of the bar, the sanctity of our judicial system, and the public trust. The more serious the past offenses, of course, the more likely the erosion of public confidence upon reinstatement.

The Preamble to the American Bar Associations' Model Rules of Professional Conduct provides that "a lawyer should further the public's understanding of and confidence in the rule of law and the justice system because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority." Lawyers must be aware of the duty owed to the public, the judicial system, and the bar. Every applicant for admission to the bar takes a solemn oath "to truly and honestly demean myself in the practice of my profession to the best of my skill and abilities, so help me God." Tenn. Sup. Ct. R. 6 (2007).

In Schoolfield v. Tennessee Bar Association, 353 S.W.2d 401, 404 (Tenn. 1961), this Court has articulated the importance of attorney integrity in our system of justice:

> It is the duty of an attorney to uphold the honor of the profession of law; to be honest, to be of good conduct in the discharge of his duties to the Court, the public and his clients. Attorneys are trusted by the community with the care of their lives, liberty and property with no other security than personal honor and integrity.

> The trust and confidence which must necessarily be reposed in an attorney requires him to maintain a high standard of moral character and a due appreciation of his duty to his profession, the courts and the public. He is charged with the duty of good faith and honorable dealing on all occasions.

---

[13] Our review on policy matters affecting public confidence in the judiciary is comparable to the review of a trial court's application of the law to the facts–de novo with no presumption of correctness. State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeager, 958 S.W.2d 626, 629 (Tenn. 1997).

Other jurisdictions have addressed the impact of an attorney's conduct involving crimes that reflect upon the integrity of the judicial system and public confidence. The Supreme Court of Kansas, in permanently disbarring an attorney for conspiring to bribe a police officer, made the following observation:

> Conspiracy to bribe a police officer in order to protect and promote other illegal activities is an offense that is totally repugnant to the administration of justice and the duties of an attorney who has taken a solemn oath to uphold the constitutions and laws of the United States and the State of Kansas. Such an offense strikes at the very heart of our criminal justice system and if tolerated could completely destroy our system of justice as it has always existed in this country.

State v. Russo, 630 P.2d 711, 716-17 (Kan. 1981); see also In re Brown, 273 S.E.2d 567, 571 (W.Va. 1980) (denying reinstatement for an attorney who was convicted of conspiracy to commit bribery and bribery of a juror because reinstatement would have a "justifiable and substantial adverse effect on public confidence in the administration of justice").

In our review of the impact of Hughes' restatement on the integrity of the bar, the administration of justice, and the public interest, we first address two of the findings that served as a basis for the trial court's denial of reinstatement. Initially, the trial court found in June of 2007 that "the passage of just less than seven years from the date of Mr. Hughes' conviction and suspension is an insufficient period of disbarment," given the egregiousness of his act and the serious obligations that he accepted as a member of the legal profession. That was a miscalculation of the length of the disbarment. In fact, Hughes had been disbarred for almost ten years at the time the judgment was filed. Aside from the minimum requirement for five years, this Court has never recognized any particular lapse of time before a petition to reinstate might be filed. Moreover, under our rules, it is the attorney's moral qualifications, competency and learning in the law, and the impact of the attorney's reinstatement on the integrity of the bar, administration of justice, and public interest that are paramount in the determination of eligibility for reinstatement. The length of the disbarment is only a factor.[14] Tenn. Sup. Ct. R. 9, § 19.3. Secondly, the trial court found that Hughes had not

---

[14] The case of In re Hiss, 333 N.E.2d 429 (Mass. 1975) (overruled in Aetna Casualty and Surety Co. v. Niziolek, 481 N.E.2d 1356 (Mass. 1985) as to point of law relating to the preclusive effect of a conviction obtained after a trial in subsequent civil litigation) is representative of the majority view that reinstatement is always available after a disbarment. In 1950, Hiss was convicted of two counts of perjury for testimony provided a federal grand jury after an investigation by the Committee on Unamerican Activities to the House of Representatives. United States v. Hiss, 185 F.2d 822 (2d Cir. 1950), cert. denied 340 U.S. 948 (1951); see also United States v. Hiss, 107 F.Supp. 128 (S.D.N.Y. 1952), aff'd per curiam, 201 F.2d 372 (2d Cir. 1953), cert. denied 345 U.S. 942 (1953). He served three and one-half years in a federal prison. On August 1, 1952, Hiss was disbarred. Twenty-two years later, Hiss, then sixty-nine years of age, filed a petition for reinstatement to the bar of Massachusetts. Despite the fact that perjury was classified as an "attack on the foundation of our judicial system," the Supreme Judicial Court of Massachusetts determined that "the serious nature of the crime and the conclusive evidence of past unfitness to serve as an attorney do not necessarily disqualify" a petitioner. 333 N.E.2d at 433. That court held that no "offense is so great that a disbarred attorney is automatically precluded from attempting to demonstrate . . . that he has achieved a present fitness to serve as an attorney and has led a sufficiently exemplary life to inspire confidence once again, in spite of his previous actions." Id. at 433. Further, the court observed that "the public welfare, 'the true test' in all proceedings for reinstatement, calls for [the

18

made any effort to pay his fines or make restitution to his former clients in those instances where he had taken money for little or no services in return. While the record was not entirely clear at the time the trial court entered its judgment, the post-judgment facts submitted by Hughes establish that he has made restitution to his former clients, has paid all court costs, and is making monthly payments on his $15,000 fine. Other than paying the full amount of the fine, a task which will take several years at the current payment schedule, Hughes has met his financial obligations. Both the Panel and the trial court recognized his limited earning powers. That he is making some effort to pay under those circumstances is helpful to his cause.

While recognizing that it is an attorney's "absolute duty to conduct himself so as to reflect credit upon himself and the [legal] profession," Schoolfield, 353 S.W.2d at 404, we also recognize, in disciplinary proceedings, the importance of documenting any efforts toward professional reformation and personal redemption. Those efforts reflect not only upon the moral character issue, but are relevant to this third criterion as well. In its decision to set aside the Panel's judgment, the trial court, referencing Murphy, observed:

> The attitude of our Supreme Court regarding this type of conduct [bribery] is expressed in Murphy v. Board of Professional Responsibility, [citation omitted]. In that case the attorney was convicted in federal court of perjury and obstruction of justice by attempting to improperly influence the testimony of a witness before the federal grand jury. He entered a guilty plea in the disciplinary proceeding in exchange for a five year suspension of his law license. Like Mr. Hughes, Mr. Murphy had a number of witnesses who testified as to their high opinions of his morality and legal competence. Nevertheless, the Supreme Court denied his application for reinstatement because '(s)uch conduct strikes at the very heart and soul of the judicial system and without question would have a detrimental impact on the integrity and standing of the bar, the administration of justice and the public interest.'

In Murphy, where the panel denied reinstatement and the trial court reversed, granting a conditional reinstatement, we sided with the panel, placing particular emphasis on the fact that Murphy, a sitting judge, held a position of public trust. 924 S.W.2d at 647.[15] We observed that "the publicity and notoriety attendant to his conduct . . . was much greater than it otherwise would have been had he been simply a practicing attorney." Id. We concluded that the testimony was

---

opportunity to establish rehabilitation]." Id. at 435 (citations omitted) (quoting In re Keenan, 314 Mass. 544, 547 (1943)). In judging whether Hiss satisfied the requisite rehabilitation, the Massachusetts court considered (1) the nature of the original offense; (2) the character, maturity, and experience of the petitioner at the time he was disbarred; (3) his work history and conduct since the disbarment; (4) the time elapsed since the disbarment; and (5) his present competence in legal skills. Id. at 437-38. Because well over twenty years had elapsed since Hiss's disbarment and because he had developed a reputation of honesty and rectitude, industriously supported his family, and pursued "scholarly interests" through a program of diverse lectures and the publication of articles and books, he was reinstated into the practice of law.

[15] Ira H. Murphy, a general sessions judge in Shelby County, Tennessee, was convicted of lying to a federal grand jury and attempting to get another person to lie to the grand jury.

"completely devoid of specific facts and circumstances which have arisen since [his] convictions that demonstrate either rehabilitation or remorse . . . [and that] [t]here [was] no specific evidence in the record as to the efforts [he] has made to reform and make amends . . . ." Id.

In contrast, the record before us consists almost entirely of the efforts that Hughes has made toward rehabilitation since his trial and convictions. The evidence shows that Hughes has embraced his religious faith, maintained his employment, and addressed bar groups about his serious mistakes as a lawyer and the change he has undergone in his life since his convictions. While his crimes do indeed strike at the "very heart and soul" of our system of justice, we cannot conclude, as we did in Murphy, that the record is devoid of specific evidence demonstrating efforts "to reform and make amends." For that, Hughes merits some commendation. But there remains the considerable issue of how, on balance, reinstatement at this time, in the context of such serious offenses, might be perceived as a reflection of the quality of the bar and the impact on the public's confidence in the administration of justice.

In In re Raimondi, 403 A.2d 1234, 1239 (Md. 1979), the Maryland Supreme Court acknowledged that "[t]here may be a point in time when it is proper to reinstate to the practice of law even one who has committed a most heinous crime." However, in considering an application for reinstatement by two disbarred attorneys, one of whom had been convicted of embezzlement, larceny, and conspiracy and the other of whom had been convicted of attempting to bribe a member of the legislature, the Maryland Supreme Court–recognizing that the more serious the original misdeeds, the heavier the burden to prove fitness for reinstatement–applied a balancing test. Id. That is, while acknowledging its essential duty to maintain the faith and confidence of the public, the Maryland court weighed the egregiousness of the misconduct of the attorneys against their subsequent efforts at reformation, present moral character, and present competence to undertake the practice of law. In weighing those factors, the Maryland court declined to reinstate. Id. at 1240-41.

In this instance, the BPR offered plausible testimony on the potential negative impact of Hughes' reinstatement as to the integrity of the bar. The district attorney, the representative of the Nashville Bar Association, and a law school dean who teaches the ethics of the profession spoke against reinstatement. Thus, in 2005, three respected lawyers representing important components of the legal profession continued to express concern about the propriety of a reinstatement. On the other hand, the witnesses appearing on Hughes' behalf, most of whom are active members of the bench and bar, expressed the belief that because of his exceptional efforts, the integrity of the bar would not be compromised.

As stated, however, it is our ultimate responsibility to determine whether the heartfelt testimonials by witnesses favorable to Hughes trump our own assessment of the likely effect of his reinstatement upon the public confidence in the administration of justice. In addressing that issue, we have a duty to apply our own sense of values. Hughes' crimes, conspiracy to bribe and the bribery of an eyewitness, were committed in a first-degree murder charge where he acted as defense counsel. Clearly, his acts demonstrated a flagrant disregard for the principles upon which our legal system is grounded. See In re Renfroe, 695 A.2d 401, 404 (Pa. 1994) ("When an attorney attempts to bribe a witness or a court official for the purpose of affecting the outcome of a judicial proceeding,

he has stricken at the heart of the judicial system itself."); In re Disciplinary Proceedings Against Kronenberg, 117 P.3d 1134, 1140 (Wash. 2005) (stating that "[a]ttempting to tamper with a witness represents a flagrant disregard for the very principles upon which our legal system is grounded and renders an attorney unfit to practice law) (quoting In re Disciplinary Proceeding Against Stroh, 644 P.2d 1161, 1167 (1982)). The egregiousness of his conduct cannot be overstated. Even though thirteen years have passed since the crimes and eleven years since the disbarment, it is our view that the preservation of the integrity of the bar and our interest in the protection of the public outweigh the totality of Hughes' rehabilitative efforts. That is, the evidence is not sufficient to resolve our doubts on this important criterion. The practice of law is a distinct privilege–the more serious the abuse of that privilege, the more onerous the burden of atonement. In summary, we conclude that his reinstatement to the practice of law at this time would be detrimental to the standing of the bar, the administration of justice, and the public interest. In making this assessment, we acknowledge our role as the final disciplinary authority for violations of the rules governing our profession and our inherent power to administer those rules.

### Conclusion

Pursuant to our analysis in Love, section 1.3 of Supreme Court Rule 9 should be applied retrospectively. Trial courts must review a hearing conducted by a panel of the Board of Professional Responsibility on the transcript and may take additional proof only as a means of resolving any irregularities in the process. Reversal is warranted under these circumstances only if the Panel acted arbitrarily or with caprice or made a ruling "unsupported by evidence which is substantial and material."

In this particularly difficult case, we find that the third criterion for reinstatement, when subjected to a broadened scope of review, was not supported by "substantial and material evidence" overcoming the nature of the crimes. Because his rehabilitation efforts thus far do not outweigh the seriousness of the crimes, Hughes' reinstatement would be detrimental to the integrity of the bar, the administration of justice, and protection of the public interest. Accordingly, we affirm the judgment of the trial court. Costs of this appeal are assessed to the petitioner.

_____
GARY R. WADE, JUSTICE

21