# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 6, 2013 Session

## WALTER RAY CULP, III v. BOARD OF PROFESSIONAL RESPONSIBILITY FOR THE SUPREME COURT OF TENNESSEE

**Direct Appeal from the Chancery Court for Williamson County**
**No. 40516     Walter C. Kurtz, Judge**

---

**No. M2012-01816-SC-R3-BP - Filed June 24, 2013**

---

In this appeal, we review the denial of an attorney's petition for reinstatement of his law license. The attorney was suspended from the practice of law for five years after he pleaded guilty to attempted extortion in federal court. The extortion arose out of the attorney's attempt to broker the testimony of a witness in a civil trial for a substantial fee. After serving a nineteen-month prison sentence and a five-year suspension from the practice of law, the attorney petitioned for reinstatement. A hearing panel of the Board of Professional Responsibility denied the attorney's request, finding that the attorney failed to carry his burden of proof by clear and convincing evidence that he had the moral qualifications, competency and learning in law, and that reinstatement would not be detrimental to the integrity and standing of the bar, the administration of justice and subversive to the public interest. The panel considered, among other things, the nature of the crime, that the extortion involved several million dollars, the attorney's unwillingness to take responsibility for his actions, and his lack of credibility. The attorney appealed to the Chancery Court for Williamson County. The trial court affirmed the hearing panel's decision. We affirm the decision of the trial court.

**Tenn. Sup. Ct. R. 9, § 1.3 Appeal as of Right; Judgment of the Trial Court Affirmed**

SHARON G. LEE, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, and WILLIAM C. KOCH, JR., JJ., joined. CORNELIA A. CLARK, J., not participating.

Walter Ray Culp, III, Brentwood, Tennessee, pro se with assistance of counsel by James D.R. Roberts, Jr. and Janet L. Layman, Nashville, Tennessee; Tyree B. Harris, IV at trial, Nashville, Tennessee, for the appellant.

Kevin D. Balkwill, Disciplinary Counsel, Brentwood, Tennessee, for the appellee, Board of Professional Responsibility.

**OPINION**

**I.**

Walter Ray Culp, III graduated from law school in 1995 and became licensed to practice law in Tennessee in 1996. In December 2004, Mr. Culp was indicted by a federal grand jury for the Middle District of Tennessee. On September 14, 2005, a two-count superseding indictment charged Mr. Culp with violating federal extortion and mail fraud laws. The first count of the indictment alleged that Mr. Culp attempted to extort a cash payment of $5 million and real estate valued at $4 million from officers of AIM Healthcare ("AIM"), a Franklin, Tennessee-based healthcare company, by threatening to cause the suppression of a witness's testimony in AIM's lawsuit against Arbor Healthcare.[1] The second count alleged that Mr. Culp devised a scheme to defraud AIM by informing AIM executives that the witness was seeking over $3 million for his truthful testimony when in fact Mr. Culp was intending to pay the witness $200,000 while keeping the rest for himself, and executed the scheme by means of an interstate telephone call to AIM executives.[2]

On December 22, 2005, the Board of Professional Responsibility ("the Board") filed a petition for discipline against Mr. Culp based on the conduct described in the superseding federal indictment. On February 14, 2006, Mr. Culp pleaded guilty in federal court to attempted extortion. On April 3, 2006, we summarily suspended Mr. Culp from the practice of law and referred the matter to the Board of Professional Responsibility to determine the final discipline. *See* Tenn. Sup. Ct. R. 9, § 14 ("Attorneys Convicted of Crimes"). Meanwhile, a federal district court judge sentenced Mr. Culp to thirty-six months in prison. After serving nineteen months at a federal prison in Alabama, Mr. Culp was paroled on supervised release.

On September 30, 2008, a hearing panel of the Board conducted a hearing to determine Mr. Culp's final discipline. The hearing panel determined that Mr. Culp's law license should be suspended for five years. The five-year suspension consisted of a two-and-one-half-year suspension pursuant to this Court's summary suspension, beginning on April 3, 2006, and an additional two-and-one-half-year suspension, beginning on September 30, 2008.

---

[1] Count one alleged that Mr. Culp violated 18 U.S.C. §§ 1951, 1952 (2006).

[2] Count two alleged that Mr. Culp violated 18 U.S.C. §§ 1342, 1343 (2006).

Mr. Culp did not appeal the judgment. On April 15, 2009, the Board forwarded a copy of the hearing panel's decision to this Court pursuant to Tenn. Sup. Ct. R. 9, § 8.4.[3] On June 17, 2009, we entered an order that proposed to increase Mr. Culp's punishment to disbarment. After oral argument, we approved the five-year suspension.

On January 13, 2011, Mr. Culp filed a petition pursuant to Tenn. Sup. Ct. R. 9, § 19.3 seeking reinstatement of his law license effective April 3, 2011.[4] Mr. Culp asserted that he possessed the requisite moral qualifications and competency and learning in the law. He also maintained that his reinstatement would not be detrimental to the integrity and standing of the bar or of the administration of justice or subversive to the public interest. After an evidentiary hearing, the hearing panel of the Board of Professional Responsibility ("the Panel") denied Mr. Culp's petition for reinstatement, finding he did not carry his burden of proof by clear and convincing evidence. The Panel found that Mr. Culp's witnesses were not able to testify with any degree of specificity about the crime for which he was suspended, his moral qualifications to practice law, and his learning in the law. The Panel also found that the testimony of Mr. Culp's witnesses was conclusory, very general, and was based on insufficient contact with Mr. Culp. The Panel found that Mr. Culp had not disclosed the details of his crime to his witnesses; instead, he only had told them that he had been in prison or had made some bad decisions. Moreover, the Panel determined that Mr. Culp was not credible, particularly with regard to his description of the crime he committed:

> Petitioner's testimony on the topic of his crime was elusive and incredible. Despite having pleaded in Federal Court to the crime of extortion and serving time in prison for that crime, Petitioner could still not bring himself to admit to the Hearing Panel that he did what he was accused of doing and what he pleaded guilty to doing. Petitioner consistently laid the blame for his predicament on others and seemed unable to admit to himself or the Hearing Panel that he did what he pleaded guilty to doing. This does not exhibit to the Hearing Panel that the Petitioner has the moral qualifications to resume the practice of law.

The Panel concluded that none of the witnesses were able to testify as to Mr. Culp's current competency and learning in the law. The Panel noted that only Mr. Culp testified as to his current learning in the law. It pointed out that Mr. Culp took seventy hours of

---

[3] Sup. Ct. R. 9, § 8.4 requires the Board to forward to this Court any judgment in a lawyer discipline case in which the hearing panel recommends a punishment in excess of three months. Pursuant to this rule, this Court reviews the recommended punishment to ensure "uniformity of punishment throughout the state."

[4] Sup. Ct. R. 9, § 19.1 provides: "No attorney suspended for one year or more or disbarred may resume practice until reinstated by order of the Supreme Court, except as provided in Section 20.4."

mediation training courses in 2010 to bring his continuing legal education ("CLE") requirements current, but described this as a "transparent attempt to catch up on his CLE requirements." The Panel expressed concern that Mr. Culp would do whatever he needs to do to obtain the result that he desires. As an example, the Panel noted that Mr. Culp denied any alcohol or drug problems to the probation officer before his sentencing, in his pre-Panel hearing discovery responses, and in his testimony before the Panel. However, while in prison, he claimed he had a problem with alcohol and applied for and was admitted to a drug abuse program. After he successfully completed the program, his prison sentence was reduced by five months. Mr. Culp testified that he "modeled himself as a perfect person" in order to try to gain early release. The Panel was concerned that Mr. Culp was once again "modeling" himself to regain the right to practice law when he in fact did not meet the requirements for reinstatement.

The Panel concluded that given the nature of the crime, Mr. Culp's continuing unwillingness to take responsibility for his actions, his lack of credibility, and his willingness to keep up appearances to get what he wants, Mr. Culp's readmission "would be detrimental to the integrity and standing of the bar and the administration of justice as well as being subversive to the public interest."

Mr. Culp filed a petition for review in the Chancery Court for Williamson County, asserting that the Panel's decision was arbitrary and not supported by substantial and material evidence. The trial court, after reviewing the evidence presented to the Panel, affirmed the Panel's decision. The trial court found that the Panel's credibility findings were supported by the record, citing the Panel's conclusion that Mr. Culp's testimony regarding his crime was "elusive and incredible." Further, the trial court found that the Panel's decision regarding Mr. Culp's deficient moral and legal fitness was supported by the record. The trial court also concurred with the Panel's finding that Mr. Culp's reinstatement would be detrimental to the integrity and standing of the bar and the administration of justice, noting that Mr. Culp's crime "involved the brokering of witness testimony in a pending civil case," which struck at "the very heart of the integrity of the legal system he was sworn to serve." The trial court concluded that the record fully supported the Panel's decision that Mr. Culp's license to practice law should not be reinstated. Mr. Culp appeals the decision of the trial court.

**II.**

Tenn. Sup. Ct. R. 9, § 19.3 governs reinstatement of suspended or disbarred attorneys. It requires an attorney petitioning for reinstatement to establish by clear and convincing evidence that he or she:

has the moral qualifications, competency and learning in law required for admission to practice law in this state and that the resumption of the practice of law within the state will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive to the public interest.

A trial judge reviewing a hearing panel's decision may reverse or modify that decision if the panel's findings are:

(1) in violation of constitutional or statutory provisions; (2) in excess of the panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in light of the entire record.

Tenn. Sup. Ct. R. 9, § 1.3.

Our review is governed by the same standard of review as that of the trial court. *Milligan v. Bd. of Prof'l Responsibility*, 301 S.W.3d 619, 629 (Tenn. 2009); *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d 631, 640-41 (Tenn. 2008); *Bd. of Prof'l Responsibility v. Love*, 256 S.W.3d 644, 653 (Tenn. 2008). This standard of review does not allow us to substitute our judgment for that of the Panel as to the weight of the evidence on factual issues. *Milligan*, 301 S.W.3d. at 635. We will reverse or modify a trial court's judgment only if it meets one of the five enumerated criteria listed in Tennessee Supreme Court Rule 9, section 1.3. *Hughes*, 259 S.W.3d at 640-41. The Supreme Court has the ultimate power to ensure adherence to professional responsibility standards, *Doe v. Bd. of Prof'l Responsibility*, 104 S.W.3d 465, 469-70 (Tenn. 2003), and possesses an "inherent power" over lawyer discipline cases. *Hughes*, 259 S.W.3d at 640.

Based on Mr. Culp's contentions in this appeal, we review the evidence presented to the Panel to determine whether the Panel's decision was arbitrary and capricious or unsupported by substantial and material evidence. To reverse on either of these grounds requires us to find a clear error in judgment. *Milligan*, 301 S.W.3d at 629.

At the hearing on August 31, 2011, the Panel heard the testimony of Mr. Culp and nine witnesses. Testifying on Mr. Culp's behalf were four attorneys, Raymond T. Throckmorton, III; Frank Calvin Ingraham; Tom Price Thompson, III; and Jonathan Jacob

Cole;[5] and five lay witnesses, Dewey Allen Greene; Robert High Bradshaw, Jr.; Michael Ray Campbell; Henry James Askew; and Dr. Gerald Lynn Stow. The Board presented no witnesses.

Mr. Throckmorton, a Nashville attorney, testified that he had been friends with Mr. Culp since childhood. After Mr. Throckmorton moved to Nashville in 1996, he had limited contact with Mr. Culp. He first learned of Mr. Culp's criminal involvement from a mutual friend who had seen it on the news. He testified that he was surprised that Mr. Culp had engaged in criminal conduct and blamed others for taking advantage of Mr. Culp's "tunnel vision" for concentrating on "what's positive about the situation" and getting "sucked into it." He did not visit with Mr. Culp while he was in prison, but reestablished contact with him after Mr. Culp was released. Mr. Throckmorton talked with Mr. Culp a couple of times a month in the year before the Panel hearing. He testified that Mr. Culp was a very competent attorney who had a budding practice until "the unfortunate matter." He testified that Mr. Culp's crime was inconsistent with Mr. Culp's character. He said the entire process "has been a life-changing experience" for Mr. Culp, who had "sort of risen out of the ashes." In his opinion, Mr. Culp had the requisite moral qualifications to practice law and had done a "very good job" of staying current with the law.

Mr. Ingraham, an attorney for more than fifty-three years, testified that he met Mr. Culp after Mr. Culp's mother asked Mr. Ingraham to mentor Mr. Culp following his release from prison. Mr. Ingraham explained that he often mentored young men. When Mr. Ingraham contacted Mr. Culp, Mr. Culp was "very responsive and appreciative." Most of their contacts occurred by telephone and concerned Mr. Culp's marital problems. As to Mr. Culp's criminal history, Mr. Ingraham said he did not make it his business to find out about the crime. He knew Mr. Culp committed a crime involving an "issue of honesty," but intentionally did not inquire into the details of the crime. He only learned about the nature of Mr. Culp's criminal conduct a few weeks before the reinstatement hearing, but noted that Mr. Culp did not blame other people for his misfortune and took full responsibility for his actions. Mr. Ingraham testified that Mr. Culp would be an asset to the legal profession if his license was restored. Mr. Ingraham offered to serve as a mentor to Mr. Culp "if the Board felt it was a good thing."

Mr. Thompson, a lawyer practicing in Lebanon, testified that he had previously worked with Mr. Culp on a workers' compensation case and a construction case. He said he was impressed by Mr. Culp's work and that Mr. Culp showed great passion for his clients. Mr. Thompson's knowledge of Mr. Culp's criminal involvement was based on what

---

[5] Mr. Cole could not testify in person at the August 31, 2011, reinstatement hearing. The hearing panel considered Mr. Cole's testimony given at Mr. Culp's September 2008 disciplinary hearing.

he read in the newspaper. After Mr. Culp was released from prison, they had lunch several times and emailed each other periodically. Mr. Thompson testified that Mr. Culp "has paid his dues, and I think he wants to go forward in the legal profession." In his opinion, Mr. Culp has the requisite moral character and legal training to practice law.

Mr. Cole, a Nashville attorney, explained he and Mr. Culp had been friends for the past fourteen years. Mr. Cole first learned about Mr. Culp's criminal involvement from reading about the case in the newspaper and he later discussed it generally with Mr. Culp, although not in "extreme detail." Before Mr. Culp's suspension, he had the reputation of being a good attorney and of high character. In Mr. Cole's opinion, Mr. Culp was proficient in the law and very remorseful about what he had done.

Mr. Greene, the chief operating officer of a small healthcare company in Brentwood, attended church with Mr. Culp's mother. He met Mr. Culp after Mr. Culp's mother asked if Mr. Greene would meet with her son. Mr. Culp contacted Mr. Greene, and they met frequently to talk about Mr. Culp's marital difficulties. Mr. Greene said that Mr. Culp "walked me through all that transpired" regarding Mr. Culp's criminal trouble. Mr. Greene said he learned more about it from reading newspaper stories about the criminal charges. Mr. Greene said he did not believe Mr. Culp would repeat his criminal conduct. Mr. Culp, in Mr. Greene's opinion, was "humbled and reaching out and doing everything within his power to provide for his family and his children."

Mr. Bradshaw, a probate master for Davidson County, knew Mr. Culp from their days as law clerks in the Davidson County Courthouse. He testified he learned about Mr. Culp's crime from a courthouse employee. Mr. Bradshaw never talked specifically with Mr. Culp about his criminal case; what Mr. Bradshaw knew, he learned from reading the newspaper or from others. Mr. Bradshaw said he spoke more often with Mr. Culp's former wife than with Mr. Culp. He recalled that Mr. Culp had been a "very competent" lawyer when he handled cases in probate court. He testified that Mr. Culp "would make an exemplary attorney in my opinion."

Mr. Campbell, a contractor, testified that he had known Mr. Culp for three years. He first met Mr. Culp through some real estate business, but then they became personal friends. Mr. Campbell talked regularly with Mr. Culp and considers him a good man. The two have vacationed together at Gulf Shores, Alabama, where Mr. Campbell has a condominium. He testified that Mr. Culp told him "there was some stuff that went on that he regrets pretty bad." Mr. Campbell could not remember specifics regarding Mr. Culp's crime, saying: "Obviously, we didn't talk about it much."

Mr. Askew, a deacon at Woodmont Baptist Church, testified that he had known Mr. Culp since Mr. Culp was born. One of Mr. Askew's sons and Mr. Culp were close friends,

and his son still maintains contact with Mr. Culp. Mr. Askew first learned of Mr. Culp's crime from reading about it in the newspaper and then from talking with Mr. Culp's mother. Mr. Askew visited Mr. Culp in prison several times. Mr. Askew testified that Mr. Culp has "very good moral character," and that if he needed a lawyer, he would hire Mr. Culp.

Dr. Stow, a retired Baptist minister, testified that he first met Mr. Culp in 2008, after learning about him from Mr. Culp's mother. Mr. Culp attended Dr. Stow's Bible study classes upon his release from prison. He testified that Mr. Culp said to everyone in attendance at his first Bible study class that he was an attorney who made some bad choices and served time in prison. Mr. Culp never told Dr. Stow about his criminal conduct, but Dr. Stow learned about it after viewing a videotape of Mr. Culp speaking to a nearby church group about his bad choices and the resulting consequences. Dr. Stow could not recall the details but said "it pretty much had to deal something with some land transactions and so on." Dr. Stow explained that Mr. Culp earnestly tried to improve as a person and had established "spiritual accountability." He said Mr. Culp expressed remorse over his past conduct.

Mr. Culp, a resident of Brentwood, testified that he began practicing law in 1996 in Williamson County. He began his practice as a solo practitioner taking appointed criminal defense work, but after a couple of years, he practiced primarily personal injury civil litigation. He testified he became a "self-made millionaire" by age thirty-five and amassed a net worth in excess of $15 million by age forty. He indicated he made much of his fortune by practicing law and buying and selling land.

He explained that a former client, Jason Quick, told him that for a fee of $5 million, Mr. Quick would be willing to testify in an antitrust lawsuit involving AIM, a healthcare company. According to Mr. Quick, he had information that would help AIM win its case against Arbor Healthcare. Mr. Culp communicated Mr. Quick's offer to Carl Haley, who owned 15% of AIM, and to Preston Ingram, who was AIM's majority shareholder and chairman of the board. Mr. Culp testified that after several discussions with Mr. Haley and Mr. Ingram, they decided that Mr. Culp and Mr. Ingram would trade farms and Mr. Culp would pay Mr. Quick "out of [Mr. Culp's] own pocket to tell the truth." Mr. Culp had previously negotiated with Mr. Ingram to swap farms but had not been able to arrive at a mutually agreeable price for the trade. Mr. Culp and Mr. Ingram entered into a contract whereby Mr. Culp would convey his farm worth $15 million to Mr. Ingram and Mr. Ingram would convey his farm worth $4 million to Mr. Culp. Mr. Culp would then pay "out of his pocket" Mr. Quick's witness fee, which Mr. Quick reduced from $5 million to $200,000. Mr. Culp testified that he was going to lose a couple of million dollars on the farm deal and have to pay the witness $200,000. However, later in his testimony, Mr. Culp admitted that in addition to the farm swap, Mr. Ingram was going to pay Mr. Culp "five and a half million in boot." He also admitted that he owed about $2 million on his farm which was later sold by

his bank for a "million seven." Mr. Culp admitted that he knew the deal was unethical but did not think it was illegal. He testified that he did not expect to benefit financially from the transaction and was "actually taking a hit for doing the transaction." When he was indicted, he was "totally dumbfounded." Mr. Culp claimed he was not acting as a lawyer, but as a friend stuck in the middle trying to bring out the truth to the "people that needed the truth." According to Mr. Culp, Mr. Quick and Mr. Ingram "just needed a scapegoat, somebody to get in the middle so if things went bad, they had somebody to point the finger to and they wouldn't get in trouble." Mr. Culp also testified that he "took the bath for everyone."

Mr. Culp explained that he wanted to plead to an aiding and abetting charge, because he did not believe he was guilty of attempted extortion, because "I never twisted anybody's arm to do anything." The federal government would not accept a guilty plea to aiding and abetting, so Mr. Culp pleaded guilty to attempted extortion. He said he pleaded guilty because he was facing a potential sentence of twenty years and a $250,000 fine. At the Panel hearing, Mr. Culp continued to disagree that he was guilty of attempted extortion but acknowledged that he knew what he had done was illegal "without question."

Mr. Culp also testified about his entry into a drug abuse program while in prison. Mr. Culp admitted that in answering questions for a federal presentence report, he denied that he had abused alcohol or prescription drugs. Mr. Culp testified he first learned of the program from his lawyer and then from other inmates. Mr. Culp admitted to the Panel that he "drank socially" but did not think he had a problem with alcohol. He had seen a psychiatrist and was taking a prescribed anti-depressant drug before he left for prison. He later told prison officials he had a drinking problem because his then-wife had convinced him that he had an alcohol problem. After Mr. Culp entered prison, he applied for and was accepted into a Residential Drug Abuse Program. He successfully completed the program, which resulted in a five-month reduction in his sentence.

Because of his imprisonment, Mr. Culp fell behind on his CLE requirements. Mr. Culp caught up on his CLE requirements in 2010 by completing seventy hours of mediation training. He said that "the mediation aspect is very attractive to me," and "I think I would be a very good mediator."

Mr. Culp testified that he was embarrassed, remorseful, and ready to resume the practice of law as a better attorney and person. He noted that "the practice of law is a privilege" and "an honorable, noble profession."

The standard of review guides the result in this case. The Panel is uniquely suited to make credibility determinations of witnesses. The trial court showed deference to the credibility determinations of the Panel. We show the same level of deference to the trial court

and the Panel. Mr. Culp was required to show by clear and convincing evidence that he had the moral qualifications and competency and learning in the law required for admission to practice law in Tennessee and that his readmission would not be detrimental to the integrity of the bar or the administration of justice. Tenn. Sup. Ct. R. 9, § 19.3.

In *Milligan,* we examined the moral qualifications requirement in Rule 9, § 19.3, explaining that attorneys seeking readmission must show a "moral change." 301 S.W.3d at 631. They also must show remorse and an awareness of their wrongdoing. *Id*. Attorneys presenting character witnesses must establish these witnesses were aware of the underlying misconduct and had "a sufficient degree of interaction" with the petitioning attorney. *Id*. at 632. These witnesses must present more than conclusory testimony about an accused's change of character. In *Milligan*, we discounted the testimony of witnesses who were largely unaware of the specific conduct that led to the suspension and had minimal contact with the attorney during the suspension period. *Id.* at 633. In *Murphy v. Bd. of Prof'l Responsibility*, 924 S.W.2d 643, 647 (Tenn. 1996), we discounted the "totally conclusory" testimony of witnesses who said the attorney seeking readmission had "paid the price," was remorseful, and had rehabilitated himself.

The Panel was not persuaded that Mr. Culp carried his burden of proof by clear and convincing evidence that he was morally qualified to resume practicing law. The Panel viewed much of Mr. Culp's witnesses' testimony as conclusory and noted that many of the witnesses had minimal contact with Mr. Culp. The Panel concluded:

> The various witnesses called by Petitioner to testify as to his character and moral qualifications, while all persons of apparent high character themselves, were unable to testify with any degree of specificity as to the full nature of Petitioner's original crime for which he was suspended or to testify in any detail as to Petitioner's moral qualifications to practice law. The statements by the witnesses on this issue were conclusory and very general and were based on insufficient contact or involvement with Petitioner to speak to his current character or moral qualifications. It was clear that Petitioner had never revealed or disclosed to these witnesses the full details of the crime to which he pleaded guilty. The Petitioner confided to most of these witnesses only that he had been in jail or that he had made some bad decisions.

Witnesses must be "aware of the nature of the misconduct that resulted in suspension," and there must be a "sufficient degree of interaction between the witness and the petitioning attorney so that the witness had a reasonable basis for his or her opinion." *Milligan*, 301 S.W.3d at 632. "Otherwise the witness's testimony will carry little, if any, weight." *Id*. The Panel's conclusion that several of Petitioner's witnesses gave conclusory testimony regarding his crime and did not express specific knowledge of his

underlying crime is supported by substantial and material evidence and is not arbitrary and capricious. Mr. Campbell did not know why Mr. Culp lost his law license. Mr. Askew, who learned of Mr. Culp's criminal trouble from the newspaper and from Mr. Culp's mother, never testified as to any specific knowledge of the underlying crime and did not apparently discuss that in any detail with Mr. Culp. Mr. Greene testified that Mr. Culp "walked me through the circumstances," but Mr. Greene did not appear to have specific knowledge of the criminal charges. Mr. Ingraham testified that he did not know the specifics of the crime and did not make it his business to know such. Mr. Bradshaw testified he had not talked with Mr. Culp about the criminal charges. Mr. Cole discussed the crime with Mr. Culp but not in "extreme detail."

Mr. Culp and his witnesses lacked the "sufficient degree of interaction" identified as crucial in *Milligan*, 301 S.W.3d at 632. Mr. Thompson testified he had gotten together with Mr. Culp three or four times for lunch and exchanged "numerous e-mail correspondences" and "several telephone conversations." Mr. Bradshaw met Mr. Culp for breakfast in Franklin, but his testimony did not reflect that they communicated frequently. Mr. Bradshaw said he communicated more with Mr. Culp's ex-wife than with Mr. Culp. Mr. Cole did not have significant contact with Mr. Culp after he returned to Nashville from prison. While other witnesses stayed in more frequent contact with Mr. Culp, their testimony does not satisfy Mr. Culp's significant burden of proof. An attorney seeking readmission must do more than present witnesses who testify the attorney "paid the price," is rehabilitated, and is remorseful. *Murphy*, 924 S.W.2d at 647. "The evidence necessary to demonstrate that one is morally qualified to practice law in this state requires more than conclusory statements. . . ." *Hughes*, 259 S.W.3d at 643.

While much of the witness testimony was conclusory, an even greater problem for the Panel and the trial court was the issue of credibility. The Panel stressed that Mr. Culp's "testimony on the topic of his crime was elusive and incredible." The Panel also determined that Mr. Culp "still could not bring himself to admit . . . that he did what he was accused of doing and what he pleaded guilty to doing." The Panel reasoned that Mr. Culp had credibility problems which prevented him from clearing the moral qualifications hurdle. The trial judge agreed the Panel's decision was supported by the record. Mr. Culp bears the burden of showing by clear and convincing evidence that he had the moral qualifications necessary to practice law. We agree with the Panel and the trial judge that Mr. Culp failed to present sufficient proof by clear and convincing evidence that he had the moral qualifications necessary for readmission.

The Panel also determined that Mr. Culp failed to meet his burden in showing that he had the competence and learning in the law sufficient to warrant readmission. The Panel found that none of Mr. Culp's witnesses "were able to testify as to Petitioner's current competency and learning in the law." The Panel stressed that only Mr. Culp provided

testimony that he possessed the necessary learning in the law. Mr. Cole, Mr. Bradshaw and Mr. Thompson all testified to Mr. Culp's competency as an attorney *before* Mr. Culp's criminal activity. Mr. Throckmorton testified that Mr. Culp had done a "very good job" of staying current with the law. This conclusory testimony is not nearly enough to satisfy Mr. Culp's burden of proof as to competency and learning in the law.

The Panel was critical of Mr. Culp's compliance with the CLE requirements by taking seventy hours of mediation training in 2010. The Panel referred to this as a "transparent attempt to catch up on his CLE requirements in anticipation of filing the Petition on which this hearing is based." While we agree that Mr. Culp could have done much more to prove his legal competency, we do not agree that extensive mediation courses should count against any attorney. The Board focused on Mr. Culp's decision not to take his CLE hours in areas of law that he practiced before his unfortunate foray into the criminal justice system. However, when questioned as to what areas of law he would practice if his license was reinstated, Mr. Culp mentioned contract litigation, personal injury, estate work, and mediation. He testified that mediation work appealed to him and that he "would be a very good mediator." There is nothing suspect about an attorney taking mediation training courses to satisfy CLE requirements. However, Mr. Culp did not present any more evidence on the issue of learning in the law and competency other than completing the requisite hours of CLE. There is substantial and material evidence supporting the Panel's decision that Mr. Culp failed to prove by clear and convincing evidence that he had the requisite learning in the law to be reinstated to the practice of law.

Mr. Culp also was required to establish by clear and convincing evidence that his readmission to the practice of law would not be detrimental to the administration of justice. We must determine what impact Mr. Culp's reinstatement will have on the integrity of and public trust in our system of jurisprudence. *Hughes*, 259 S.W.3d at 646-47. The egregiousness of Mr. Culp's crime cuts to the heart of the integrity of the legal system.

We find *Hughes* controlling. In *Hughes*, a criminal defense attorney with prior disciplinary history attempted to bribe a witness in a criminal case. For this conduct, we disbarred the attorney. After seven-and-one-half years, the attorney petitioned for reinstatement. Fifteen witnesses, including several former and current judges, testified on his behalf. *Id*. at 635. The hearing panel granted reinstatement. A trial court reversed and denied reinstatement, finding that the attorney's readmission would be detrimental to the administration of justice. The attorney appealed and we affirmed the judgment of the trial court, explaining that the "egregiousness of his conduct cannot be overstated." *Id*. at 651.

The license to practice law is a privilege, not a right. Tenn. Sup. Ct. R. 9, § 3.1; *Murphy*, 924 S.W.2d at 647. "The practice of law is a distinct privilege—the more serious the abuse of that privilege, the more onerous the burden of atonement." *Hughes*, 259 S.W.3d

at 651. A sister jurisdiction denied reinstatement to a disbarred attorney convicted of conspiracy to commit extortion, explaining: "His illegal activity circumvented the justice system's fairness and impartiality and injured the Bar's reputation for professionalism." *Stewart v. Miss. Bar*, 5 So. 3d 344, 350 (Miss. 2008). An attorney has the ethical responsibility to serve the administration of justice as a professional and as an officer of the court. Mr. Culp seriously abused that privilege and flouted the Rules of Professional Conduct by his egregious action. The fact he claimed he did not know his conduct was illegal is—in the words of the Panel—"incredible." This understandably presented a significant credibility problem for Mr. Culp.

We denied reinstatement petitions in *Hughes*, *Milligan*, and *Murphy*. Although Mr. Culp's case is somewhat factually distinguishable, each of these cases involved egregious conduct by an attorney that strikes at the heart of our system of justice. Mr. Culp engaged in conduct threatening the very core of a legal system based on probity and honor. We have the "ultimate duty" to regulate the legal profession and protect the integrity of the profession. *Hughes*, 259 S.W.3d at 646-47.

Mr. Culp petitioned this Court for a second chance. Our rules allow attorneys who have been suspended or disbarred to petition for reinstatement. This process indicates that we recognize the possibility of redemption and second chances. Other jurisdictions have a similar process. "[A] felony conviction is not tantamount to a death sentence regarding the reinstatement of the license to practice law." *In re Reinstatement of Anderson*, 51 P.3d 581, 583 (Okla. 2002). The Supreme Court of Mississippi conditionally granted a disbarred attorney's third petition for reinstatement even though the attorney had a felony conviction for filing a false currency reporting form. *See In re McGuire*, 912 So. 2d 902 (Miss. 2005).

In conclusion, we hold that the decisions by the Panel and the trial court denying reinstatement are not arbitrary and are supported by material and substantial evidence. Mr. Culp failed to prove by clear and convincing evidence that he had the moral qualifications, competency and learning in the law required for admission to practice law in Tennessee, and that his readmission would not be detrimental to the integrity of the bar or the administration of justice. Tenn. Sup. Ct. R. 9, § 19.3. In particular, the egregious nature of Mr. Culp's criminal offense and his credibility problems identified by the Panel and the reviewing trial judge convince us that reinstatement is not warranted.

We affirm the judgment of the trial court affirming the Panel's denial of Mr. Culp's petition for reinstatement. Costs are assessed to Walter Ray Culp, III, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE

-13-