IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 8, 2017 Session

## DRAYTON BEECHER SMITH, II v. BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESSEE

**Appeal from the Chancery Court for Shelby County**
**No. CH-16-0528-I   William B. Acree, Jr., Special Judge**

---

**No. W2017-00247-SC-R3-BP**

---

Drayton Beecher Smith, II ("Attorney") pled guilty in 2007 to federal charges of receipt and possession of images depicting child pornography and was sentenced to five years of imprisonment. In conjunction with these charges, Attorney consented to his disbarment, which was ordered in 2008. In August 2014, after being discharged from prison and while on probation, Attorney petitioned to be reinstated to the practice of law in Tennessee. The Board of Professional Responsibility ("BPR") opposed Attorney's petition, and a hearing panel was appointed ("the Panel"). After an evidentiary hearing, the Panel denied Attorney's petition. Attorney sought review in chancery court, and the chancery court reversed the Panel's decision and ordered Attorney reinstated. The BPR sought review in this Court. Initially, we hold that the chancery court had subject-matter jurisdiction of Attorney's petition in spite of the BPR's untimely filing of its application for costs. We further hold that the chancery court misapplied the applicable standard of review and thereby committed reversible error. Accordingly, we reverse the chancery court's ruling and reinstate the Panel's decision.

**Tenn. Sup. Ct. R. 9, § 33.1(d);**
**Judgment of the Chancery Court Reversed;**
**Decision of the Hearing Panel Reinstated**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

A. Russell Willis, Brentwood, Tennessee, for the appellant, Board of Professional Responsibility.

Lucian T. Pera and J. Bennett Fox, Jr., Memphis, Tennessee, for the appellee, Drayton Beecher Smith, II.

## OPINION

### Factual and Procedural Background

Attorney originally was admitted to the practice of law in Tennessee in 1974 and established himself in the practice area of trusts and estates. As of 2007, Attorney had not been disciplined by the BPR. In November 2006, Attorney was arrested on a seven-count federal indictment related to the receipt and possession of child pornography, based on images discovered on Attorney's laptop computer. In June 2007, Attorney pled guilty in federal court to three of these counts. In conjunction with these charges, Attorney executed a Consent to Disbarment Affidavit in August 2007, and an Order of Disbarment was entered in May 2008. After serving a portion of his five-year sentence of imprisonment, on October 4, 2011, Attorney was transferred to a Memphis halfway house. Attorney was discharged on March 16, 2012, after completing his sentence of incarceration.

Attorney's sentence included ten years of supervised probation following his release from imprisonment. The conditions and restrictions of Attorney's probation include: (1) answering truthfully all inquiries by his probation officer, (2) registering with the sexual offender registration agency for Tennessee, (3) participating in a specialized sex offender treatment program that may include the use of a polygraph, (4) refraining from direct or indirect contact with any child under eighteen (18) years of age, (5) not possessing any pornography, (6) not using sexually oriented telephone numbers or services, (7) participating in mental health treatment as directed by his probation officer, and (8) refraining from excessive use of alcohol. Additionally, Attorney's conditions of probation provide that he "shall not possess, or use, a computer with access to any 'on-line computer service' at any location (including employment) without prior approval of the Probation Officer."

Attorney filed his petition for reinstatement on August 11, 2014. At the ensuing evidentiary hearing before the Panel, Attorney called several character witnesses, two of his treating physicians, the deputy director of the Tennessee Lawyers Assistance Program ("TLAP"), and a medical expert.[1] Attorney also testified on his own behalf. The BPR adduced a written report prepared in May 2013 by Dr. A. J. Reid Finlayson, the Medical Director of the Vanderbilt Comprehensive Assessment Program ("VCAP"), following Attorney's participation in an evaluation conducted through VCAP ("the VCAP Evaluation"). Attorney participated in the VCAP Evaluation at the suggestion of TLAP in conjunction with Attorney's effort to be reinstated.

---

[1] The Panel began hearing testimony on March 25, 2015. The hearing was suspended for Attorney to be evaluated by this medical expert, Dr. Gene G. Abel. The hearing recommenced on August 25, 2015.

The conduct for which Attorney was prosecuted consisted of his downloading onto his computer between thirty and forty photographs of girls, between nine and fourteen years of age, appearing either nude or engaged in sex acts. There was no proof, however, that Attorney ever had engaged in sexual physical contact with a child. Following his incarceration, Attorney was diagnosed with pedophilia.

Attorney testified about the conduct that resulted in his convictions:

> At the time I was suffering from chronic clinical depression. I was having trouble sleeping. I was staying up late at night. I was working on researching an appeal for my brother, who was convicted of a felony in California. And I would get tired of research, so then I would go to play games, video games, on the computer, like Spades or Hearts with other people. Online live video games.

> After that, if I got tired, I would go to look at other websites and then sometimes I would go to porn sites. I went to a couple of the porn sites, and there were things called pop-ups which said come to this site and see this, and one of them mentioned minors, and I was just curious to see what it was. It was curiosity that got me in trouble. I went there and looked at it, and I guess I downloaded—I did download a few images, not a whole lot, but enough to get me in trouble.

> Some people have thousands and thousands and thousands. I think I had less than 40, but they were enough to get me in trouble, and I did download some of those images.

Attorney added that he "just wanted to see what was going on, what people were doing" and that he was "just curious to see how wild and crazy it could be." Attorney acknowledged that he knew his conduct was wrong at the time and that he "shouldn't have done it." He explained that "at the time [he] thought it was a victimless crime" and that he "did not think [he] was hurting anybody." Since his arrest, he had come to understand through counseling the harm that his actions caused to the persons in the images.

After his release from prison, Attorney participated in a specialized sex offender treatment program through Counseling Resources of America. The entire program consisted of four phases, all of which he had completed by the time of the hearing. Attorney stated that it took him approximately two and one-half years to complete the program. The first phase consisted of weekly meetings, with the latter phases requiring meetings every other week. Following this program, Attorney completed a ten-week pilot program involving cognitive behavior that was led by his probation officer.

Attorney stated that he had not had any violations of his probation.

On cross-examination, Attorney stated that he participated in the VCAP Evaluation "[t]o have professional people assess [him] to see if [he was] mentally and physically fit to practice law." Asked if he was truthful during his evaluation, Attorney responded, "[p]ainfully brutally truthful. They couldn't help me if I wasn't." Attorney confirmed that, as reflected in the VCAP Evaluation, he had used his computer after his release to alter adult comic strip figures in order to make them appear nude for self-gratification.[2] He explained, "I was having trouble adjusting. I was having trouble with my wife's health. I'm not allowed to have pornography. I was taking images on a scanner and changing them to erotic images to help me with my fantasy. I was not saving them. I was making those images for that moment and then erasing them." Attorney stated that he engaged in this behavior for "a couple of months" in late 2012 and/or early 2013 and attributed his conduct to stress. He added, "I stopped doing it because I realized—you talk about stop signs and triggers. I saw what was wrong, and I stopped it. But even after I talked to the people at Vanderbilt about it, I realized that that was what they call a slippery slope, like you don't want to go on doing something like that, so I did stop that, and I have not resumed that practice." Attorney stated that he had not disclosed this conduct to anyone before his VCAP Evaluation. He had never disclosed this use of his computer to produce possibly pornographic images[3] to his probation officer. Attorney explained, "I have not because I just—it was something that I self-remedied. It's not gone on. It's not a problem." Attorney also admitted that he had not disclosed this conduct to his counselor at Counseling Resources of America, explaining that he did not "because it was already passed. Once it was over, it was over."

Attorney also admitted during cross-examination that, since his release from prison, he had engaged in fantasizing about underage females for self-gratification, conduct that he also reported during his VCAP Evaluation. Based in part on these fantasies, the VCAP Evaluation provides that Attorney

> does have some factors that likely elevate his risk of sexual offending. In
> particular, he clearly has deviant sexual arousal to prepubescent females.

---

[2] Attorney would scan images of adult comic strip characters such as Blondie and Betty Boop from the newspaper into his computer and then use the computer's software program to "paint" flesh colors over the characters' clothing to make them appear nude. The record does not indicate whether, in undertaking this activity, Attorney used a computer "with access to any 'on-line computer service'" which would have violated the terms of Attorney's probation unless Attorney had first received his probation officer's approval.

[3] As set forth above, the conditions of Attorney's supervised release prohibit him from possessing any pornography. It is unclear, and not necessary to our resolution of this matter, whether the images that Attorney created would fall within the definition of "pornography." See generally Michael Smith, Note, Barely Legal: Vagueness and the Prohibition of Pornography as a Condition of Supervised Release, 84 St. John's L. Rev. 727 (Spring 2010).

4

Furthermore, he is actively engaging in fantasy and regularly experiencing arousal to sexual images and fantasy of girls, which is clearly not consistent with recommended treatment for sexual offenders[.]

Attorney testified that he stopped this fantasizing "about six months after" he participated in the VCAP Evaluation. He stated that he no longer fantasized about young girls, adding that he had to take a polygraph every six months and had answered that question truthfully.

Attorney stated that he had not told his character witnesses about the behavior reported in the VCAP Evaluation, explaining that the witnesses were his friends, not his doctors.

On questioning by the Panel about the VCAP Evaluation, Attorney acknowledged that "[s]ome of [his] actions [since his release from prison] could be construed to violate [his] probation." Attorney emphasized that, long before the hearing, he had stopped engaging in both the fantasizing and the cartoon alterations. One of the Panel members expressed concern with Attorney's status as a sex offender and, if Attorney were reinstated, the impact of that status on the integrity of the bar. Attorney acknowledged that people were going to "hate [him] just because they know [he is] a sex offender."

Attorney was evaluated again in May 2015 by Dr. Gene G. Abel, Medical Director for the Behavioral Medicine Institute of Atlanta. Dr. Abel is a psychiatrist specializing in the field of sexual misconduct. Dr. Abel testified that Attorney had disclosed to him his previous fantasies about underage females and his use of a computer to alter cartoon characters. Attorney told Dr. Abel that he had stopped this behavior. Dr. Abel explained that the cartoon-altering behavior was "an indirect measure of interest in children." Dr. Abel also explained that he did not expect persons in therapy for pedophilia to reveal all of their inappropriate thoughts or behavior immediately but that, if therapy were effective, the person would reveal more of "those things" over time as the therapeutic relationship evolved.

Dr. Abel concluded that Attorney had made progress in his treatment since the VCAP Evaluation. In his written report, which was admitted into evidence, Dr. Abel supported Attorney's reinstatement, subject to a number of strict conditions including ongoing treatment and polygraphs.

Dr. Jeffery Warren, Attorney's primary care physician, testified by deposition. Dr. Warren testified that he diagnosed Attorney with depression in December 1998, many years prior to Attorney's conviction. When Dr. Warren saw Attorney after his release from incarceration, Attorney "did not seem actively depressed at that point." Dr. Warren also "saw no evidence" of an alcohol problem since Attorney's release. In Dr. Warren's opinion, Attorney's current mental health indicated that he was fit to resume the practice

5

of law.  Dr. Warren also opined that Attorney "is an ethical man."  Dr. Warren last saw Attorney in October 2014.

Dr. Allen O. Battle, a psychologist, first saw Attorney in 1996 for a session of clinical hypnosis aimed at helping Attorney remember a specific event.  Dr. Battle next saw Attorney in 1999 for acute stress related to matters involving Attorney's twin brother.  Dr. Battle continued to see Attorney until 2002, by which point Attorney had improved.  Attorney returned to Dr. Battle in 2005 due to the stress he was experiencing as a result of the criminal investigation against him related to the child pornography found on his computer.

Dr. Battle was aware that Attorney was later convicted of possessing child pornography, which Dr. Battle understood to consist of photographs of children, some of them consisting of "nude single photos" and some of them depicting the subjects engaged in sexual activity.

Dr. Battle saw Attorney in 2012 for "an anxiety disorder."  Attorney improved over the course of his treatment.  Dr. Battle also saw Attorney in January 2015 to evaluate his "present psychological function" in preparation for Attorney's quest to be reinstated.  Dr. Battle testified that, in 2015, Attorney was handling the stresses in his life much better than he had previously.

Attorney discussed with Dr. Battle the conduct that led to his conviction.  In Dr. Battle's opinion, Attorney felt remorse for his conduct.  Dr. Battle further testified that he had no reason to suspect that Attorney would re-offend.  Dr. Battle elaborated: "[Attorney] has been burned so thoroughly by all of this that has happened to him over the last six or seven years that I don't think he would touch it with a barge pole."

Dr. Battle had reviewed the VCAP Evaluation and described it as the "most comprehensive" evaluation he had ever read in his fifty-seven years of practice.  Dr. Battle did not agree with all of the VCAP Evaluation's recommendations or conclusions.

Dr. Battle opined that Attorney was fit to resume the practice of law.  He also stated that he would not hesitate to recommend Attorney to friends or family.

On cross-examination, Dr. Battle stated that Attorney disclosed to him Attorney's use of the computer to alter cartoon images.  Dr. Battle also stated that he was concerned that Attorney had masturbated to imaginary images of children "because they are not socially acceptable libidinal objects."  Dr. Battle also was concerned that Attorney had not disclosed this activity to his probation officer.

In response to a question from the Panel, Dr. Battle agreed that there is a social stigma attached to persons diagnosed with pedophilia.

6

Attorney also called a number of character witnesses. Frank Michael Bursi, a lawyer, testified that he had practiced with Attorney for approximately ten years from 1990 to 2000. Mr. Bursi stated that he was aware that Attorney had pled guilty to a federal offense involving the receipt and possession of child pornography. Since Attorney's release from prison, Mr. Bursi's contact with Attorney was limited to a dinner party and several phone calls.

Mr. Bursi described Attorney as "highly professional in his work" and added that he had seen Attorney "do very good legal work." Mr. Bursi stated that he had no reason to doubt Attorney's integrity and honesty as a lawyer and no reason to doubt his moral qualifications to handle legal matters. Mr. Bursi indicated that, in his view, it would be "a good thing for the legal profession and administration of justice in Tennessee for [Attorney] to be reinstated to the practice of law." Mr. Bursi added, "I think he's a good lawyer. I think he's paid his debt to society. I think he's rehabilitated himself, and I think the profession would be helped by his practice."

Carl Thomas Jackson testified that Attorney had provided him with legal services for himself and his daughter who had a special-needs trust. He was aware that Attorney had been convicted of a federal crime involving the receipt and possession of child pornography. Mr. Jackson considered himself a friend of both Attorney and Attorney's wife. Mr. Jackson believes that Attorney has the moral qualifications to practice law and that he is an honest man. Mr. Jackson did not know whether Attorney was remorseful for the conduct that led to his conviction but assumed that he was. Mr. Jackson testified that he would have no hesitation about hiring Attorney again if he were reinstated.

Robert Benham, retired lawyer and judge, testified that he had served as a judge of the Shelby County Probate Court for fifteen years. He knew Attorney both from Attorney's appearances before the bench and previously when they were both in private practice. Judge Benham testified that, before he was disbarred, Attorney's reputation as a lawyer "was a very, very good one." During Attorney's appearances before Judge Benham, Attorney never gave him a reason to doubt his integrity or honesty.

Judge Benham was aware that Attorney had been convicted of a crime involving the receipt and possession of child pornography. Judge Benham supported Attorney's reinstatement to the bar:

> I think he would do a good job. He's always done a good job in the past, and there's no reason to believe that he wouldn't continue to do that in the future. The matter about which he was convicted in my opinion had nothing to do with his professional ability or his integrity as far as honesty with the court, honesty with his clients, honesty in handling funds of clients.

7

Donn Allen Southern testified that he served as a judge in the Shelby County Probate Court for almost eighteen years. Prior to that time, he was engaged in private practice. Attorney practiced regularly before him while he was on the bench. Judge Southern stated that Attorney had a good reputation as a lawyer and was "known as a capable, intelligent attorney, skilled especially in that area of estate planning and wills and practice in probate court." Judge Southern added that he "never saw anything of a negative nature at all in the way he handled matters and represented his clients." Attorney never gave him any reason to doubt Attorney's integrity or honesty. Judge Southern was aware that Attorney had been convicted of a federal crime involving the receipt and possession of child pornography. Judge Southern testified that he thought it would be a "good thing" if Attorney were reinstated, adding, "I know nothing about the details of his conviction and guilty plea other than what I've been told, but I have no reason to think that he would not resume a very reputable practice of law and represent clients in a proper manner."

On cross-examination, Judge Southern stated that he had read about Attorney's offense in the newspaper and that Attorney also told him personally that he had had child pornography on his computer. Judge Southern did not know any of the details of Attorney's offense.

One of the Panel members asked Judge Southern if Attorney's status as a registered sex offender, which rendered information about Attorney's crime available to the public, impacted his opinion about the effect of Attorney's reinstatement on the integrity and standing of the bar. Judge Southern responded,

> I think most people realize that they have failings in their lives, and he has paid his debt to society, obviously in terms of what the court sentence involved.

> I think I'm a pretty good judge of character; and having known [Attorney], I just feel that he would handle himself in a proper manner, that that's not something that would be repeated.

> I know he's had treatment and gone through counseling and that sort of thing, and this is a big city. I don't think there would be that much—I don't think there would be that much talk about it. There might be some, you've got to recognize that. There are some people that are going to know about that. But that's my opinion.

James P. Cole testified that Attorney was a good friend, and they corresponded while Attorney was in prison. Mr. Cole was aware of the reasons for Attorney's incarceration. In Mr. Cole's opinion, Attorney was remorseful for his actions, and he "recognized he has a problem to deal with, and he's doing his best to deal with it." Mr.

8

Cole also stated that he had "a very strong opinion that that will never happen again," adding,

> I just think he's learned his lesson. He's dealt with it. He's a strong man, he's got a strong sense of character; and if he makes up his mind that this is what he's going to do, this is what he's going to do. I just think he's turned the page on all that.

Mr. Cole had no reason to doubt Attorney's honesty or integrity, and he would have no hesitation about recommending Attorney's services if Attorney were reinstated. Mr. Cole stated that Attorney had "always been sorry about what happened." Mr. Cole stated that Attorney's reinstatement "would be an act of compassion that's overdue."

On questioning by a member of the Panel, Mr. Cole testified that he and Attorney "never discussed the facts involved in the offense for which he pleaded guilty."

Fletcher Haaga, a trust officer with Comerica Bank, testified that he had a long professional relationship with Attorney, as well as a friendship. Attorney's professional reputation was "very good." Mr. Haaga was aware of Attorney's crime. Asked about Attorney's remorse, Mr. Haaga stated that he believed Attorney was remorseful based on Attorney's "demeanor." Mr. Haaga added, "[Attorney] has never come out and said I'm so sorry for all this, but you could just—in conversations with him, you could just feel it." Mr. Haaga had no concerns about Attorney's honesty or integrity. Mr. Haaga supported Attorney's reinstatement, stating that he had persons that he wanted to refer to Attorney.

On cross-examination, Mr. Haaga stated that he had heard people say negative things about Attorney and that "[c]ommon sense" told him that Attorney's reputation "probably" was negatively impacted by Attorney's conviction.

On questioning by the Panel, Mr. Haaga stated that he had not discussed the details of Attorney's crime with Attorney.

Frank Holeman, the executive manager of a diabetes treatment clinic, employed Attorney for legal business advice beginning in 2003. Attorney's work was "excellent." Mr. Holeman was aware of Attorney's crime. After Attorney was released from prison, Attorney provided Mr. Holeman with clerical and proofreading assistance for Mr. Holeman's business. Mr. Holeman stated that he had been in touch with Attorney at least weekly since Attorney's release. Mr. Holeman described Attorney as "a man of great character." Mr. Holeman added, "I know his love for the law, and never has he ever said anything or done anything that made me think ever that he would compromise what he, as an officer of the court, would do." Mr. Holeman has complete faith in Attorney's honesty and integrity. Asked about whether Attorney was remorseful, Mr. Holeman

9

answered, "He was crushed.  As he looks back at it, he was crushed that he would do anything that would jeopardize his professional integrity, that would damage his family." He added, "He's not sorry because he got caught.  He's sorry because it ever happened in the first place."  Mr. Holeman opined that Attorney would never re-offend.

On cross-examination, Mr. Holeman acknowledged that Attorney's reputation "was diminished in the eyes of many people" as a result of his conviction.  He added that a potential investor in his company declined to invest based on Attorney's assisting the company with its informational materials.

Alva B. Weir, III, M.D., testified that he had been acquainted with Attorney since they were children.  Dr. Weir corresponded with Attorney during Attorney's incarceration and saw him frequently after Attorney's release.  Dr. Weir hired Attorney to prepare his manuscripts for submission to an agent.  Dr. Weir was familiar with Attorney's conviction and, based on their conversations, knew that Attorney was remorseful.  He added that, since Attorney's release, he had "not detected any moral or ethical failure" by Attorney.  He added that he had "detected no evidence" to suggest that Attorney would re-offend.  Dr. Weir supported Attorney's reinstatement on the basis that he would "add to the profession without hurting the profession."

On cross-examination, Dr. Weir acknowledged that Attorney had not told him the details of his criminal conduct.

Henry Robert Heller, III, testified that Attorney had performed legal work for him and that they were also friends, having known each other for over thirty years.  Mr. Heller visited Attorney three times while he was incarcerated and also corresponded with Attorney.  Mr. Heller had faith in Attorney's honesty and integrity, both within and outside of the attorney-client relationship.  Mr. Heller thought that Attorney was remorseful for his criminal conduct, but did not supply details supporting this conclusion. Based on his "gut feeling," he did not think Attorney would re-offend.

On cross-examination, Mr. Heller acknowledged that he did not know the details of Attorney's crimes and that they had not discussed the matter since Attorney's release.

Charles Howard Davis, Jr., testified that he and Attorney grew up together and that Attorney had practiced law with Mr. Davis' father for a time.  Mr. Davis stated that Attorney had been his personal and business attorney since 1976.  Mr. Davis was aware of Attorney's convictions and visited him several times while Attorney was incarcerated. Mr. Davis also corresponded with Attorney. Mr. Davis also has spent time with Attorney on numerous occasions since Attorney's release.  Mr. Davis testified that Attorney was remorseful for his criminal conduct, stating, "He's really sorry for what he did."  Mr. Davis explained that he knew Attorney was remorseful based on "his actions."  Mr. Davis had no doubts about Attorney's honesty and integrity.

10

On cross-examination, Mr. Davis acknowledged that Attorney's reputation had been damaged by his conviction.

On questions from the Panel, Mr. Davis stated that he did not know the details underlying Attorney's conviction, had not discussed it with Attorney, and did not know how Attorney came to possess child pornography.

Eyleen Farmer, associate rector at Calvary Episcopal Church, began her association with Attorney at his sentencing when she appeared "as a show of support from his faith community." She corresponded with Attorney while he was incarcerated. Attorney rejoined the congregation after he was released. Ms. Farmer considered Attorney "a faithful and sincere participant in the church community," explaining that he attended every Sunday.

On cross-examination, the lawyer representing the BPR asked Ms. Farmer if Attorney had "asked for forgiveness from you or the church for his actions." Ms. Farmer responded, "Not in those words that I remember." In response to a question from the Panel, Ms. Farmer explained that Attorney had counseled with one of her male colleagues.

After considering all of the proof, the Panel denied Attorney's petition in a comprehensive nineteen-page written judgment filed on November 30, 2015. The Panel concluded that Attorney had failed to prove by clear and convincing evidence that he possesses the moral qualifications required to practice law in Tennessee. In particular, the Panel found that,

> while [Attorney] called multiple character witnesses who testified as to his moral qualifications, the statements were conclusory and unsupported by specific facts demonstrating rehabilitation or remorse. Most witnesses had minimal contact with [Attorney] following his release from prison, and none knew the details of his crimes or conviction beyond what was reported in the news. None of the character witnesses were knowledgeable about [Attorney's] treatment or his conduct subsequent to his release from incarceration.

The Panel also expressed concern that Attorney had not disclosed his inappropriate behavior to his probation officer, noting that "[h]onesty is considered to be a centerpiece of good moral character." The Panel also made an implicit finding adverse to Attorney's credibility.[4] As we have recognized, "[t]he Panel is uniquely suited to make credibility

---

[4] The Panel stated that Attorney's "testimony that he has had a spiritual and emotional change is undermined by a number of facts and a failure of proof sufficient to meet his burden" and that his "pronouncements since his release from incarceration are inconsistent with his known actions."

11

determinations of witnesses." Culp v. Bd. of Prof'l Responsibility, 407 S.W.3d 201, 208 (Tenn. 2013).

The Panel further concluded that Attorney's reinstatement "will be detrimental to the integrity and standing of the bar, administration of justice and the public interest." In this regard, the Panel made specific note that Attorney's crime consisted of the knowing receipt and possession of visual depictions of minors engaged in sexually explicit conduct in violation of federal law; that Attorney is a registered sex offender; that Attorney is a diagnosed pedophile; that Attorney remains on probation with the United States Bureau of Prisons until 2022; and that Attorney has been untruthful with, and failed to disclose pertinent information to, his probation officer. Stating that any one of these factors would be sufficient to support a finding that Attorney's reinstatement would be detrimental, the Panel also set forth the following in support of its conclusion:

> [Attorney] is undoubtedly aware and had multiple of his own witnesses, including two physicians, testify there is a negative public stigma attached to individuals convicted of paraphilia and pedophilia offenses. Several of his friends including Mr. Cole, Mr. Haaga and Mr. Holeman testified [Attorney] has lost friends, had his reputation damaged and will suffer public scorn from his criminal history and conviction. Moreover, both Dr. Battle and Dr. Abel testified as to the negative social stigma attached to sex offenders and pedophilia/paraphilia patients. Dr. Abel testified the general public believes paraphilia patients cannot be successfully treated. Even [Attorney] acknowledged during his testimony, people are going to hate him just because they know he is a sex offender and that is not something that will go away.

On January 7, 2016, thirty-eight days after the Panel filed its judgment, the BPR filed its application for costs. On January 28, 2016, the Panel acted on the application, filing its findings and judgment for assessment of costs. On March 28, 2016, Attorney filed a petition for review of the Panel's decision with the Chancery Court of Shelby County. The BPR answered, and in due course, the chancery court reviewed the record of the proceedings before the Panel. The chancery court did not consider any additional proof. After hearing argument by the parties, the chancery court issued a twenty-page order reversing the Panel's decision and ordering that Attorney be reinstated to the practice of law in Tennessee "subject to the conditions set out by TLAP in the existing monitoring agreement[5] and any additional conditions required by TLAP." (Footnote added). The chancery court determined that the Panel's conclusion that Attorney lacked the moral qualifications to be readmitted to the bar was "unsupported by evidence which is both substantial and material in the light of the entire record" and that the Panel's

---

[5] Attorney entered into a monitoring agreement with TLAP on June 8, 2015, after Dr. Abel evaluated Attorney.

12

conclusion that Attorney's reinstatement to the practice of law would be detrimental to the integrity and standing of the bar, the administration of justice, and the public interest was "based solely on the nature of the crime committed and . . . [was] arbitrary and capricious and not supported by substantial and material evidence." The chancery court also reversed the Panel's award of costs to the BPR.

The chancery court's order was filed on December 15, 2016. On January 11, 2017, the BPR filed its notice of appeal. We now consider four issues: (1) whether Attorney's petition for review filed with the chancery court was untimely and deprived that court of subject-matter jurisdiction; (2) whether the chancery court misapplied the correct standard of review and thereby committed reversible error in overruling the Panel's decision; (3) whether the chancery court erred by reversing the Panel's award of costs to the BPR; and (4) whether this Court should consider post-judgment facts regarding Attorney's participation in the TLAP monitoring agreement.

## Subject-Matter Jurisdiction

The BPR contends that the chancery court lacked subject-matter jurisdiction over Attorney's petition for review because Attorney's petition was filed sixty days after the Panel issued its ruling on the BPR's late-filed application for costs rather than sixty days after the Panel's judgment on the merits. We begin our consideration of this issue with a review of the pertinent rules.

Tennessee Supreme Court Rule 9, Section 31.3(a), provides that "[i]n the event that a . . . denial of reinstatement results from formal proceedings, Disciplinary Counsel shall within fifteen days from the hearing panel's submission of such judgment . . . make application to the hearing panel for the assessment against the . . . petitioning attorney of the necessary and reasonable costs of the proceedings . . . ." Tenn. Sup. Ct. R. 9, § 31.3(a) (2014). The petitioning attorney then has fifteen days within which to submit any response in opposition to Disciplinary Counsel's application. Id. The hearing panel thereupon has fifteen days from the date that the petitioning attorney's response is due in which to submit its findings and judgment with respect to Disciplinary Counsel's application. Id. Section 31.3(a) further provides that "[t]he making of an application under this Section shall extend the time for taking steps in the regular appellate process under Section 33.1(a) unless, upon application of the [BPR] to the Court and for good cause shown, the Court orders otherwise." Significantly, this provision does not refer to the making of a *timely* application.

Tennessee Supreme Court Rule 9, Section 33, which governs the appeals of hearing panel decisions, provides that the party seeking review of a hearing panel decision may do so "by filing within sixty days of the date of entry of the hearing panel's judgment a Petition for Review in the circuit or chancery court . . . ." Tenn. Sup. Ct. R. 9, § 33.1(a). Additionally, Section 33.1(a) provides that "[i]f a timely application for the

13

assessment of costs is made under Section 31.3(a), the time for appeal for all parties shall run from the hearing panel's submission of its findings and judgment with respect to the application for the assessment of costs unless, upon application of the [BPR] to the Court and for good cause shown, the Court orders otherwise." Id.

Finally, Tennessee Supreme Court Rule 9, Section 34.2, provides as follows:

Except as is otherwise provided in this Rule, time is directory and not jurisdictional. Time limitations are administrative, not jurisdictional. Failure to observe such directory time intervals may result in contempt of the agency having jurisdiction but will not justify abatement of any disciplinary investigation or proceeding.

Tenn. Sup. Ct. R. 9, § 34.2.

As set forth above, the Panel entered its judgment denying reinstatement on November 30, 2015. The BPR filed its application for costs on January 7, 2016, several weeks beyond Section 31.3(a)'s fifteen-day deadline of December 15, 2015. Attorney had until January 22, 2016, in which to respond to the application but ultimately filed no response. The Panel then had fifteen days, or until February 6, 2016, within which to act on the application, either by denying it as untimely or by considering it on the merits. The Panel chose the latter course and filed its findings and judgment regarding the application on January 28, 2016, well within its deadline. Clearly, the Panel did not deem the application's untimeliness as a bar to its consideration. Attorney filed his petition for review on March 28, 2016, sixty days after the Panel filed its order awarding costs to the BPR.

The BPR raised no issue regarding the timeliness of Attorney's petition in its answer thereto. Nor did the BPR later raise with the chancery court any concerns about that court's subject-matter jurisdiction. Now, however, the BPR argues to this Court that, when it missed its own fifteen-day deadline for the filing of an application for costs, it simultaneously doomed Attorney to a *jurisdictional* sixty-day deadline running from the Panel's original judgment for filing his petition for review regardless of the BPR's late-filed application for costs and the Panel's subsequent action thereon.

In support of its position, the BPR refers us to two reported cases construing not the provisions recited above but rather Tennessee Rule of Appellate Procedure 4 ("Rule 4"). Rule 4 requires that parties in civil litigation wishing to appeal from a final judgment in the trial court must file their notice of appeal within thirty days after the judgment appealed from has been entered. Tenn. R. App. P. 4(a). The cases cited by the BPR, Ball v. McDowell, 288 S.W.3d 833, 836 (Tenn. 2009), and Binkley v. Medling, 117 S.W.3d 252, 255 (Tenn. 2003), state that this thirty-day deadline is jurisdictional. However, as noted by this Court in Ball, this holding is based, at least in part, on

14

Tennessee Rule of Appellate Procedure 2 which states explicitly that this thirty-day rule applicable in civil cases may not be extended. See Ball, 288 S.W.3d at 836 (citing Tenn. R. App. P. 2); see also Tenn. R. App. P. 21(b) (providing that "[f]or good cause shown the appellate court may enlarge the time prescribed by these rules or by its order for doing any act or may permit an act to be done after the expiration of such time; however, the court may not enlarge the time for filing a notice of appeal prescribed in Rule 4").

We are not persuaded by the BPR's argument. First, although Tennessee Supreme Court Rule 9 explicitly incorporates the Tennessee Rules of Civil Procedure and the Tennessee Rules of Evidence in disciplinary case proceedings "[e]xcept as otherwise provided in" Rule 9, Tenn. Sup. Ct. R. 9, § 34.3(a), Rule 9 does *not* incorporate wholesale the Tennessee Rules of Appellate Procedure with regard to a party seeking a trial court's review of a disciplinary hearing panel's judgment. And while Tennessee Supreme Court Rule 1 provides that the Tennessee Rules of Appellate Procedure "shall govern all matters on appeal before this Court," "this Court" refers to the Tennessee Supreme Court, not the trial court acting as a court of review in a disciplinary matter. The BPR's extensive reliance on the construction of our Rules of Appellate Procedure, therefore, is misplaced.

Second, the provisions of Rule 9, Section 34.2, make clear that time limitations in attorney disciplinary proceedings "are administrative, not jurisdictional" unless otherwise specifically provided in Rule 9. There is no specific provision in Rule 9 making "jurisdictional" the sixty-day time limit for filing a petition for review with a circuit or chancery court.[6] Cf. Henderson v. Bd. of Prof'l Responsibility, 125 S.W.3d 405, 408–10 (Tenn. 2003) (relying on the text of former Rule 9, Section 23.2, the predecessor of current Rule 9, Section 34.2, to reject a claim that attorney's late demand for a formal hearing deprived the adjudicative body of subject-matter jurisdiction).

Third, the Panel chose to consider the merits of the BPR's untimely application for costs and, by filing an order granting the application two days before the passage of sixty days from the filing of its original judgment, gave Attorney reasonable grounds to believe that the application had "extend[ed] the time for taking steps in the regular appellate process under Section 33.1(a)." Tenn. Sup. Ct. R. 9, § 31.3(a).

Finally, as a practical matter, we are disinclined to create a loophole by which the BPR may choose to delay its filing of an application for costs in order to create confusion about the deadline for filing a petition for review. Accordingly, we hold that, if the BPR files an application for costs beyond the fifteen-day deadline set forth in Section 31.3(a), the late-filed application shall function to extend the time for taking steps in the regular

---

[6] This case does not present the issue of a late-filed petition for review filed in cases in which the BPR does not file an application for costs. We do not address that situation in this opinion.

appellate process under Section 33.1(a) to the same extent as if the application had been filed timely.

The BPR argues that this construction of Section 31.3(a) will "cast doubt upon the finality of every disciplinary judgment in which no appeal was perfected." We disagree. Our holding does not extend indefinitely the time for filing a petition for review of a hearing panel's decision. Rather, our holding simply recognizes that a late-filed application for costs by the BPR will extend the sixty-day deadline for petitions for review to the same extent that a timely application would do so. We recognize that our construction of Section 31.3(a) effectively renders superfluous the inconsistent reference in section 33.1(a) to the extension of time for appeal based on a "timely" application for costs. Nevertheless, this conundrum is best solved by the BPR either filing its applications timely or recognizing that a late-filed application will extend the time for appeal.

In sum, we hold that the chancery court had subject-matter jurisdiction of Attorney's petition for review.

## Chancery Court's Application
## of the Standard of Review

This disciplinary proceeding was initiated by Attorney seeking to be reinstated to the practice of law in Tennessee after having been disbarred. Accordingly, Attorney had the burden of demonstrating by clear and convincing evidence that he possesses "[1] the moral qualifications, [2] competency and learning in law required for admission to practice law in this state, [and 3] that the resumption of the practice of law within the state will not be detrimental to the integrity and standing of the bar or the administration of justice, or subversive to the public interest." Tenn. Sup. Ct. R. 9, § 30.4(d)(1). "Clear and convincing evidence" is that which "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established." Milligan v. Bd. of Prof'l Responsibility, 301 S.W.3d 619, 630 (Tenn. 2009) (quoting Hughes v. Bd. of Prof'l Responsibility, 259 S.W.3d 631, 642 (Tenn. 2008)). In this case, the Panel concluded that Attorney had met the second of the three prerequisites for reinstatement but had failed to satisfy his burden of proof with respect to his moral qualifications and with respect to demonstrating that his reinstatement would not be detrimental to the integrity and standing of the bar, the administration of justice, and the public interest.

Upon Attorney's appeal from the Panel's adverse decision, the trial court was bound to apply the following standard of review:

16

The review shall be on the transcript of the evidence before the hearing panel and its findings and judgment. If allegations of irregularities in the procedure before the hearing panel are made, the trial court is authorized to take such additional proof as may be necessary to resolve such allegations. The trial court may, in its discretion, permit discovery on appeals limited only to allegations of irregularities in the proceeding. The court may affirm the decision of the hearing panel or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the party filing the Petition for Review have been prejudiced because the hearing panel's findings, inferences, conclusions or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the hearing panel's jurisdiction; (3) made upon unlawful procedure; (4) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5) unsupported by evidence which is both substantial and material in the light of the entire record. In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the hearing panel as to the weight of the evidence on questions of fact.

Tenn. Sup. Ct. R. 9, § 33.1(b). The BPR contends that, in reversing the Panel's decision, the chancery court erred both by disregarding substantial and material evidence supporting the Panel's decision and by substituting its own judgment for that of the Panel's.

This Court applies the same standard of review as that imposed on the trial court. See Long v. Bd. of Prof'l Responsibility, 435 S.W.3d 174, 178 (Tenn. 2014). Thus, we must review the Panel's judgment in light of the record and determine whether the chancery court erred by setting aside the Panel's decision and granting Attorney's petition for reinstatement. Hughes, 259 S.W.3d at 641. "Fundamental to our deliberations is that the license to practice law in this state is a privilege, not a right." Id. Moreover, "[a] person suspended from the practice of law is not entitled to have that privilege restored simply because that person has served the sentence imposed for a violation of the criminal laws." Murphy v. Bd. of Prof'l Responsibility, 924 S.W.2d 643, 647 (Tenn. 1996).

We have carefully reviewed the entire record in this case, and, contrary to the chancery court's determinations, we hold that the record contains material and substantial evidence supporting the Panel's conclusion that Attorney did not carry his burden of proving by clear and convincing evidence that he has the moral qualifications required to practice law in Tennessee. We agree with the BPR that the chancery court impermissibly engaged in reweighing the evidence in order to overturn the Panel. That is, the chancery court misapplied the applicable standard of review. Because, upon the proper application

of the standard of review, the record supports the Panel's conclusion, we reverse the chancery court and reinstate the Panel's judgment.

Specifically, the record supports the Panel's concern that Attorney was less than entirely honest with his probation officer about his inappropriate activities following his release from prison. Additionally, Attorney proffered witnesses to testify about his character without providing them with adverse information that might have had a negative impact on their assessment of his character, both the details of his criminal conduct and a description of his inappropriate conduct following his release from prison. While Attorney disclosed his inappropriate activities to the persons conducting his VCAP Evaluation and to Dr. Abel, we note that both of these evaluations were sought by Attorney not in order to further his treatment but in order to obtain reinstatement. It appears that the level of Attorney's candor depends upon to whom he is speaking and for what purpose.

As noted by the Panel in its judgment, this Court has stated that "[t]he evidence necessary to demonstrate that one is morally qualified to practice law in this state requires more than conclusory statements; it should also include 'specific facts and circumstances which have arisen since [one's conviction] that demonstrate either rehabilitation or remorse.'" Hughes, 259 S.W.3d at 643 (quoting Murphy, 924 S.W.2d at 647) (alteration in original). Attorney failed to adduce sufficient clear and convincing evidence of such specific facts and circumstances. Moreover, the Panel's conclusion that several of Attorney's character witnesses gave conclusory testimony regarding his crime and did not express specific knowledge about the underlying facts is supported by substantial and material evidence.

Additionally, although Attorney adduced proof of his post-incarceration treatment, the VCAP Evaluation concluded that Attorney demonstrated "some factors that likely elevate his risk of sexual offending," including his fantasizing about female children, indicating that Attorney was not yet rehabilitated. Although Attorney adduced proof from Dr. Abel that he had progressed since the VCAP Evaluation, Attorney told Dr. Abel that he no longer was engaging in fantasizing or altering cartoons. The Panel did not find Attorney entirely credible, so the Panel had some basis for being somewhat skeptical of Dr. Abel's conclusions about Attorney's progress to date.

The record also supports the Panel's apparent difficulty in accepting at face value Attorney's protestations of remorse because he continued fantasizing about underage females after his release from prison and also engaged in cartoon-altering behavior that was, in Dr. Abel's words, "an indirect measure of interest in children."

Finally, the record supports the Panel's concern that Attorney's withholding of information from his probation officer, as well as using his computer for activities that Attorney knew might violate the terms of his probation, raised a question about

18

Attorney's honesty, an attribute that the Panel properly noted is "a centerpiece of good moral character." Milligan, 301 SW.3d at 631 (citing Schware v. Bd. of Bar Exam'rs, 353 U.S. 232 (1957) (Frankfurter, J., concurring)).

In sum, we hold that the Panel's conclusion that Attorney failed to carry his heavy burden of proving his moral qualifications to be reinstated was supported by substantial and material evidence. The chancery court erred in concluding otherwise. Because Attorney's failure to prove his moral qualifications was fatal to his effort to be reinstated, we need not consider the correctness of the Panel's conclusion regarding the impact of Attorney's reinstatement on the integrity and standing of the bar, the administration of justice, and the public interest.

## Costs Awarded to BPR by Panel

As set forth above, although the BPR filed its application for costs weeks after the deadline for doing so, the Panel nevertheless considered the application and awarded the requested costs to the BPR. The chancery court reversed the Panel's award of costs solely on the basis that the application was late-filed. The BPR contends in this Court that, because Attorney never voiced any objection to the untimeliness of the BPR's application, the chancery court's "intervention on this issue was inappropriate and improper."

We reject the BPR's attempt to use its own missed deadline as both weapon and shield. However, we also disagree with Attorney that "[t]he assessment of costs to the [BPR] is only appropriate where the [BPR] is the prevailing party" and that, therefore, the chancery court's reversal of costs was warranted because the chancery court reversed the Panel on the merits. In support of this proposition, Attorney cites to Tennessee Supreme Court Rule 9, Section 31.3(a). Contrary to Attorney's assertion, Section 31.3(a) provides that the BPR shall seek costs even when the result of the formal proceeding is reinstatement. Tenn. Sup. Ct. R. 9, § 31.3(a). Moreover, it is the attorney's burden to prove by a preponderance of the evidence that the costs sought by the BPR are unnecessary or unreasonable. Id. Clearly, the purpose of Section 31.3(a) is to allow the BPR to recover its reasonable costs in defending the integrity of the Tennessee bar. That the BPR may occasionally lose a quest to prevent a disbarred lawyer from being reinstated should not prevent the BPR from recovering the reasonable costs it incurs by undertaking the quest.

The BPR's failure to timely file its application for costs in this matter, however, should not result in the forfeiture of its award, particularly in light of Attorney's failure to object to the late filing. The Panel reviewed the application and, in due course, awarded the amount requested. There is no suggestion that the award was unnecessary or unreasonable, the two grounds provided by Rule 9, Section 31.3(a), for objections on the

19

merits. Accordingly, we reverse the chancery court's decision regarding the award of costs and reinstate the Panel's order granting costs.

### The BPR's Request that Post-Judgment Facts be Considered

The BPR has asked this Court to consider certain facts regarding a monitoring agreement that Attorney entered into with TLAP, which facts are based on conduct that occurred after the hearing before the Panel. The BPR asks that we consider these post-judgment facts as additional support for the Panel's decision to deny reinstatement. Because we have concluded that the Panel's decision must be reinstated on the record before us, this issue is moot. Accordingly, we decline to address it. See State v. Phelps, 329 S.W.3d 436, 451 (Tenn. 2010).

### Conclusion

The chancery court impermissibly reweighed the evidence in the record before it. Because the chancery court's judgment was based on an impermissible reweighing of the evidence, and because substantial and material proof supported the Panel's conclusion that Attorney had failed to prove by clear and convincing evidence his moral qualifications for reinstatement, we reverse the chancery court's ruling and reinstate the Panel's judgment, including its award of costs to the BPR. The costs of this cause are assessed to Attorney.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE